**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

KENNETH L. WILSON,
Petitioner-Appellant,

v.

FRED W. GREENE, Warden,
Mecklenburg Correctional Center,
Respondent-Appellee.

No. 98-2

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(CA-96-1133-AM)

Argued: June 2, 1998

Decided: August 27, 1998

Before WILKINSON, Chief Judge, and NIEMEYER and
MICHAEL, Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Niemeyer joined. Judge Michael wrote an
opinion concurring in part and concurring in the judgment.

_____

**COUNSEL**

**ARGUED:** Charles William Gittins, LAW OFFICES OF CHARLES
W. GITTINS, Alexandria, Virginia, for Appellant. Robert Quentin
Harris, Assistant Attorney General, OFFICE OF THE ATTORNEY
GENERAL, Richmond, Virginia, for Appellee. **ON BRIEF:** Michele

J. Brace, VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER, Richmond, Virginia; Mark E. Olive, Tallahassee, Florida, for Appellant. Mark L. Earley, Attorney General of Virginia, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

_____

**OPINION**

WILKINSON, Chief Judge:

Kenneth L. Wilson raises various claims regarding his mental capacity at the time of Jacqueline Stephens' murder. Wilson was sentenced to death for that offense. He appeals the district court's dismissal of his amended petition for a writ of habeas corpus. We affirm the district court's judgment.

I.

On March 27, 1993, Jacqueline Stephens was found naked, bound in a spread-eagle fashion to her bed, with multiple stab wounds in her chest, neck, cheek, eyebrow, and arm. The events that led to this tragedy began at approximately 3:00 a.m. that morning when Wilson entered Stephens' home in Newport News, Virginia. At knifepoint, he forced Stephens, her twelve year-old daughter Altomika, and fourteen year-old Takeshia Banks upstairs. Wilson ordered Altomika and Takeshia into a bedroom and took Jacqueline into her own bedroom. While Wilson and Jacqueline were in her bedroom, Altomika heard her mother say "Kenny, why you doing this to me? I go with Pinkey [Altomika's father], why you doing this to me?" Approximately twenty-five minutes later, Wilson and Jacqueline returned to the bedroom where the girls were. At Wilson's request, Jacqueline told the girls not to say anything; she then took a shower. While Jacqueline was showering, Wilson ordered Takeshia to disrobe, tied both girls to a bed, and blindfolded them. Wilson, while naked, proceeded to stab both girls, cutting them in the neck.

After Takeshia screamed, Jacqueline confronted Wilson in the hallway. A struggle between Wilson and Jacqueline then ensued, and

2

Altomika thought she heard her mother fall down the stairs. Altomika and Takeshia escaped their bindings and barricaded the bedroom door, but Wilson soon returned and threatened to kill Jacqueline if the girls did not open it. The girls complied, and Wilson secured their bindings and blindfolded them again. He then left the room briefly but soon returned and taunted the blindfolded girls with the knife. Wilson left again, yelling at Jacqueline to find her car keys. Altomika heard her mother begin to scream then suddenly stop screaming. Wilson returned once more, threatened to kill the girls, then withdrew. A neighbor saw Wilson depart in Jacqueline's vehicle at approximately 6:30 a.m. Shortly thereafter, the police found Jacqueline's naked body covered with blood and tied to her bed. Pubic hairs and a dried white substance which appeared to be semen were observed on her body.

A few hours later, police found Wilson in a trash dumpster, acting "peculiar." Blood tests taken at a hospital the next day revealed cocaine and opiates in his system. He also was experiencing rhabdomyolysis, a condition involving the breakdown of muscle tissue produced by severe intoxication with certain drugs, including cocaine.

Wilson was charged with murder during the commission of attempted rape, attempted rape, grand larceny, and several counts of abduction and malicious wounding. Wilson's original trial counsel requested a psychological evaluation to determine both Wilson's competency to stand trial and his sanity at the time of the offense. On May 10, 1993, Dr. Don Killian, a court-appointed clinical psychologist, reported that Wilson was competent to stand trial. In a separate report, with the heading "for defense attorney only," Dr. Killian also reported that Wilson was sane at the time of the offense. In late October, Wilson's new trial counsel filed a "Motion for Neurological, Psychological, Psychiatric and Physical Evaluation of the Defendant." The trial court granted the motion on October 27 and appointed Dr. Killian to conduct the evaluation. Dr. Killian again met with Wilson on November 5, but this time Wilson declined to discuss "his thoughts, feelings, or actions" around the time when the crime occurred and stated that his attorneys had advised him not to "discuss the details of these activities with anyone." At a November 15 hearing, Wilson confirmed that he did not want to speak to Dr. Killian.

After the trial, at which Wilson testified, a jury convicted him on all counts. Following the sentencing phase, the jury recommended a

3

death sentence based on findings of future dangerousness and vileness, and the trial court later sentenced him to death. On appeal, the Virginia Supreme Court upheld the conviction and sentence. Wilson v. Commonwealth, 452 S.E.2d 669 (Va. 1995). The conviction became final on October 2, 1995, when the United States Supreme Court denied certiorari. Wilson v. Virginia, 516 U.S. 841 (1995). The Virginia Supreme Court later denied Wilson's petition for a writ of habeas corpus. After the district court subsequently denied his federal petition, Wilson brought this appeal. Since Wilson filed his federal petition in 1997, it is governed by the noncapital provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). See Lindh v. Murphy, 117 S. Ct. 2059 (1997); Green v. French, No. 97-25, 1998 WL 237506, at *2 (4th Cir. May 13, 1998).

II.

Wilson alleges several trial errors relating to his mental health. He attributes these errors to two parties: his court-appointed mental health expert and his trial counsel. Wilson claims that Dr. Killian performed an inadequate evaluation of his sanity at the time of the offense. He also blames trial counsel for not developing evidence of his insanity and for not requesting a confidential mental health evaluation before trial. In support of these claims, Wilson relies primarily on the report of Dr. Brad Fisher, a clinical forensic psychologist appointed by the district court to assist with the preparation of Wilson's federal habeas petition. Dr. Fisher met with Wilson, examined Wilson's medical and family history, and reviewed portions of the transcript from Wilson's trial. Dr. Fisher found "the evidence is suggestive but not conclusive about the existence of a temporary condition that might have led to a plea of insanity." However, he concluded there was "little evidence of a permanent major thought disorder, psychosis, or major organic impairment."[1]

_____

[1] The parties engage in a protracted fight over whether these claims are procedurally defaulted. The Commonwealth charges that Wilson failed to raise any of these complaints until his federal habeas petition. Wilson retorts that he has several grounds establishing cause and prejudice to excuse any default such as a lengthy delay in notifying state habeas counsel of his appointment. Because we believe Wilson's claims to be meritless in all events, we need not resolve this dispute.

4

A.

We first consider Wilson's arguments relating to the evaluation performed by Dr. Killian. In Ake v. Oklahoma, the Supreme Court held that under some circumstances a state must assure an indigent defendant "access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. 68, 83 (1985). Wilson aims his attack solely on whether Dr. Killian conducted an "appropriate" examination. He contends that, had Dr. Killian conducted one, he would have uncovered the information discussed in Dr. Fisher's report.

We disagree. The Constitution does not entitle a criminal defendant to the effective assistance of an expert witness. To entertain such claims would immerse federal judges in an endless battle of the experts to determine whether a particular psychiatric examination was appropriate. See Harris v. Vasquez, 949 F.2d 1497, 1518 (9th Cir. 1990); Silagy v. Peters, 905 F.2d 986, 1013 (7th Cir. 1990). Furthermore, it would undermine the finality of state criminal convictions, which would constantly be subject to psychiatric reappraisal years after the trial had ended. Harris, 949 F.2d at 1517-18; Silagy, 905 F.2d at 1013.

This circuit consistently has "rejected the notion that there is either a procedural or constitutional rule of ineffective assistance of an expert witness, rather than ineffective assistance of counsel." Pruett v. Thompson, 996 F.2d 1560, 1573 n.12 (4th Cir. 1993); see also Poyner v. Murray, 964 F.2d 1404, 1418 (4th Cir. 1992); Waye v. Murray, 884 F.2d 765, 766-67 (4th Cir. 1989) (per curiam). For example, the defendant in Waye claimed that his psychiatrist had not performed adequately because he had failed to emphasize Waye's diminished capacity in his trial testimony. We rejected this claim and observed:

> [i]t will nearly always be possible in cases involving the basic human emotions to find one expert witness who disagrees with another and to procure an affidavit to that effect from the second prospective witness. To inaugurate a constitutional or procedural rule of an ineffective expert witness

5

in lieu of the constitutional standard of an ineffective attorney, we think, is going further than the federal procedural demands of a fair trial and the constitution require.

884 F.2d at 767.

Waye thus squarely forecloses Wilson's argument to the extent that he grounds it in a right to effective assistance from Dr. Killian. Wilson's attempt to locate such a right in the Ake decision also fails. Although Ake refers to an "appropriate" evaluation, we doubt that the Due Process Clause prescribes a malpractice standard for a court-appointed psychiatrist's performance. Rather, the decision in Ake reflects primarily a concern with ensuring a defendant access to a psychiatrist or psychologist, not with guaranteeing a particular substantive result. See Parker v. Norris, 64 F.3d 1178, 1185 (8th Cir. 1995); Harris, 949 F.2d at 1516-17; Henderson v. Dugger, 925 F.2d 1309, 1316 & n.23 (11th Cir. 1991); Granviel v. Lynaugh, 881 F.2d 185, 192 (5th Cir. 1989). The defendant in Ake, unlike Wilson, did not receive any evaluation of his sanity at the time of the offense. 470 U.S. at 72. The Court distinguished Ake's situation from two earlier decisions where the defendants, like Wilson, had received such evaluations and, thus, were not deprived of due process. Id. at 85 (distinguishing United States ex rel. Smith v. Baldi, 344 U.S. 561 (1953), and McGarty v. O'Brien, 188 F.2d 151 (1st Cir. 1951)). In this context, the precise holding in Ake was simply that the failure to provide any evaluation did not comport with the Due Process Clause. See, e.g., id. at 74 (describing holding as requiring a state to "provide access to a psychiatrist's assistance") (emphasis added); id. at 83 (describing the Court's concern "that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed") (emphasis added); cf. Tuggle v. Netherland, 516 U.S. 10, 12 (1995) (per curiam) (describing holding in Ake as requiring the "assistance" of a psychiatrist).

The above comments serve to illuminate our differences with the partial concurring opinion. That opinion would hold that the Due Process Clause guarantees Wilson the right to a thorough psychiatric examination that meets "the minimum standard of care set by the clinical psychology profession." Post at 20 (Michael, J, concurring in part and concurring in the judgment). Drawing from psychiatric texts,

6

the partial concurrence insists that due process requires an exam that includes "a careful analysis of Wilson's medical records, compilation of an accurate social history (including any history of mental illness or substance abuse), and a complete mental and physical examination (employing whatever diagnostic tests were appropriate under the circumstances)." Post at 20, n.3.

We cannot accept this position. As an initial matter, it reads more into the phrase "appropriate [psychiatric] examination" in Ake, 470 U.S. 68, 83 (1985), than that decision will bear. Significantly, there is no mention in Ake of the critical language advanced by the partial concurrence, namely the entitlement to some federally supervised standard of psychiatric care.

Moreover, although the partial concurrence purports to distinguish between "an appropriate examination from the psychiatrist" and a "general right to effective assistance of a psychiatrist," post at 30, they turn out to be one and the same. Indeed, the partial concurrence acknowledges that the basic inquiry is a malpractice determination. See post at 29 ("[T]he right to counsel deals with lawyer malpractice while the right to a psychiatrist deals with psychiatrist malpractice.") (emphasis omitted). It is easy to see where this position would lead. "The ultimate result would be a never-ending battle of psychiatrists appointed as experts for the sole purpose of discrediting a prior psychiatrist's diagnosis." Harris, 949 F.2d at 1517 (emphasis omitted) (quoting Silagy, 905 F.2d at 1013). Indeed, the partial concurrence's use of Dr. Fisher's report to pick at Dr. Killian's earlier conclusions demonstrates the psychiatric quagmire in which the recognition of this new constitutional claim would immerse us.

Finally, we are reluctant to permit the purely hypothetical horror story advanced by the partial concurrence to establish a broad, free-standing constitutional claim to the effective assistance of a psychiatrist. The Due Process Clause does not require this further transfer of function from its traditional state court locus to federal collateral review. "A conclusion to the contrary would require . . . federal courts to engage in a form of `psychiatric medical malpractice' review . . . of state court judgments." Harris, 949 F.2d at 1517 (emphasis omitted) (quoting Silagy, 905 F.2d at 1013). It is clear that Wilson committed the acts which resulted in his capital conviction. The path lit

7

by the partial concurring opinion refocuses the federal habeas inquiry from actual to legal innocence to a much greater extent than we are willing to do. See Calderon v. Thompson, 118 S. Ct. 1489, 1502-03 (1998) (distinguishing between claims of actual and legal innocence).

Even if Ake's use of the term "appropriate" suggests that an examination must satisfy some minimal level of professional competence, Dr. Killian has clearly satisfied it here. In May 1993, he interviewed Wilson for approximately ninety minutes to determine his competency to stand trial and his sanity at the time of the offense. At this meeting, he explored Wilson's educational background, medical history, and criminal record. Dr. Killian also evaluated Wilson's cognitive processes and understanding of the legal proceedings against him. Based on Wilson's criminal records and this interview, Dr. Killian concluded that Wilson was competent to stand trial and was not suffering from a significant mental disease or defect at the time of the offense. In November 1993, Dr. Killian again met with Wilson and discussed his general psychiatric condition, background, and current status. Though Dr. Fisher reviewed more records than Dr. Killian and explored Wilson's mental state in greater detail, his deeper exploration into Wilson's past does not demonstrate that Dr. Killian's examination was inappropriate.

Finally, Wilson himself appears to have been partly responsible for the difficulties that Dr. Killian encountered in conducting a more complete examination. During the November 1993 meeting, according to Dr. Killian, Wilson refused to discuss "any of his thoughts, feelings, or actions during the time frame which contained the events which ultimately led to charges against him." At a hearing shortly before trial, Wilson again made clear to the court that he did not desire an evaluation. During the hearing, the following colloquy took place between Wilson and the judge:

> THE COURT: Do you desire the psychiatric or psychological evaluation which you originally indicated to your lawyers that you did desire? Are you giving that up now?

> THE DEFENDANT: Yes, sir.

Following this exchange, in an abundance of caution the trial court declared a brief recess so that Wilson could consult with his attorneys

8

about this choice. After that conference, Wilson reaffirmed his desire not to speak with Dr. Killian:

> THE COURT: All right, Mr. Wilson. What is your pleasure with respect to the psychiatric or psychological evaluation?
>
> THE DEFENDANT: I do not want to speak to him.
>
> THE COURT: You do not want to speak to Doctor Killian, correct?
>
> THE DEFENDANT: Correct.

Dr. Killian can hardly be faulted for not conducting a more thorough evaluation when Wilson repeatedly, and after consultation with his lawyers, declined to discuss matters further with him. Thus even if Ake provided some standard for an appropriate evaluation, Dr. Killian's evaluation of Wilson satisfied it.

B.

Wilson also attributes the failure to develop a more complete mental health defense to his trial counsel. Wilson alleges two basic errors constituting ineffective assistance. First, he claims that trial counsel inadequately investigated possible defenses that Wilson was insane or lacked the requisite mens rea to commit the crimes. Second, he argues that trial counsel's October 1993 request for a mental health evaluation was delinquent and deprived him of the benefit of a confidential report. Like the district court, we find both of these claims to be meritless.

To prevail on his claims of ineffective assistance, Wilson must satisfy two well-established requirements. First, he "must show that counsel's representation fell below an objective standard of reasonableness." Strickland v. Washington, 466 U.S. 668, 688 (1984); see also Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir.), cert. denied, 118 S. Ct. 595 (1997). Our review of counsel's performance in this regard is highly deferential. Strickland, 466 U.S. at 689; Truesdale v. Moore, 142 F.3d 749 (4th Cir. 1998). Second, Wilson also must demonstrate

"a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; see also Satcher, 126 F.3d at 572. Unless Wilson satisfies both requirements, his ineffective assistance claims must fail.

Wilson's trial counsel was not ineffective in declining to investigate his mental health defenses or to develop them at trial. The decision not to pursue this line of defense more fully was a reasonable one. In May, counsel had received Dr. Killian's report concluding that Wilson was not mentally ill at the time of the offense. To be reasonably effective, counsel was not required to second-guess the contents of this report. See Pruett, 996 F.2d at 1574; Poyner, 964 F.2d at 1419; Washington v. Murray, 952 F.2d 1472, 1482 (4th Cir. 1991). Having received Dr. Killian's report, counsel understandably decided "not to spend valuable time pursuing what appeared to be an unfruitful line of investigation." Bunch v. Thompson, 949 F.2d 1354, 1364 (4th Cir. 1991). Indeed, Wilson told counsel that someone from a neighborhood crack house had committed the murder, and counsel made every effort to locate and interview any witness that might have assisted with such a defense. Counsel thus made a diligent effort to pursue promising lines of investigation, and Wilson's present attempt to challenge his counsel's decision not to investigate mental health issues more fully is "a product of hindsight and fails to address the facts reasonably relied upon by counsel at the time." Roach v. Martin, 757 F.2d 1463, 1478 (4th Cir. 1985) (citation omitted). **2**

Counsel also reasonably chose not to develop a mental health defense at trial. Decisions about what types of evidence to introduce "are ones of trial strategy, and attorneys have great latitude on where

_____

**2** For similar reasons, we reject Wilson's argument that counsel was ineffective for not requesting a psychiatric evaluation until the end of October 1993. Since Dr. Killian already had concluded that Wilson was sane at the time of the offense, counsel's decision not to seek another evaluation sooner was hardly unreasonable. Furthermore, upon giving notice of an intent to present psychological evidence in mitigation, counsel would have been required to disclose the results of such an evaluation -- regardless of when it was requested; thus, the timing of the request could not affect the trial's outcome. See Va. Code Ann. § 19.2-264.3:1.D-E.

10

they can focus the jury's attention and what sort of mitigating evidence they can choose not to introduce." Pruett, 996 F.2d at 1571 n.9 (citation omitted); see also Bunch, 949 F.2d at 1364. Here, at Wilson's insistence, counsel presented a story at trial that Wilson had not committed the crime, and Wilson testified to this effect. To present simultaneously a defense that Wilson was insane or lacked the mens rea to commit the crime would have undermined Wilson's requested strategy and undercut his own credibility.

Furthermore, even if counsel's investigation or presentation had been deficient in some regard, it was not prejudicial. Dr. Fisher's report offers only limited support for Wilson's present theory that he was insane at the time of the offense or lacked the requisite mens rea to commit an intentional crime. Dr. Fisher concluded that "there is little evidence of a permanent major thought disorder, psychosis, or major organic impairment." In this respect, his opinion tracks the May 1993 opinion of Dr. Killian, who found that Wilson "was not suffering from a significant mental disease or defect, psychosis, major organic impairment" or other similar malady at the time of the offense. Even where Dr. Fisher's opinions vary from Dr. Killian's, his endorsement of Wilson's present theory is qualified at best. Though Dr. Fisher believed that Wilson's abusive upbringing and his use of intoxicants around the time of the offense may have contributed to a temporary psychosis, he found such evidence to be merely "suggestive but not conclusive." In light of Dr. Fisher's partial agreement with Dr. Killian and his inconclusive judgment about whether Wilson was temporarily insane, counsel's failure to introduce this evidence is hardly "sufficient to undermine confidence in the outcome" of Wilson's trial. Strickland, 466 U.S. at 694; see Barnes v. Thompson, 58 F.3d 971, 980-81 (4th Cir. 1995); Poyner, 964 F.2d at 1420-21; Washington, 952 F.2d at 1482.**3**

_____

**3** Wilson briefly argues that the district court erroneously denied him an evidentiary hearing on his claims of ineffective assistance. Recently, this circuit explained that "[e]videntiary hearings have never been required on federal collateral review of state petitioners' ineffectiveness claims." Eaton v. Angelone, 139 F.3d 990, 995 (4th Cir.) (citations omitted), cert. denied, 118 S. Ct. 2338 (1998). Wilson has failed to show how an evidentiary hearing would have aided the factfinding process. Here the district court carefully considered several claims of ineffective assistance

11

III.

Wilson next presses two claims that he is actually innocent of the crimes for which the jury convicted him. He maintains that Dr. Fisher's report demonstrates that his voluntary intoxication at the time of the offense produced a temporary insanity. He also contends that the report shows his level of intoxication was so severe that he lacked the mens rea to commit an intentional crime. The district court found both of these claims to be defaulted because Wilson failed to raise them in state court. Wilson now asserts that he raises these claims simply as "`gateway[s]' through which he may pass to argue the merits of his defaulted claims." Satcher, 126 F.3d at 570.

Claims of actual innocence, whether presented as freestanding ones, see Herrera v. Collins, 506 U.S. 390, 417 (1993), or merely as gateways to excuse a procedural default, see Schlup v. Delo, 513 U.S. 298, 317 (1995), should not be granted casually. The Supreme Court recently emphasized "the narrow scope" of this type of claim. Calderon, 118 S. Ct. at 1503 (quoting Sawyer v. Whitley, 505 U.S. 333, 340 (1992)) (other citation omitted); see also Turner v. Jabe, 58 F.3d 924, 931-32 (4th Cir. 1995). The claim "must be based on reliable evidence not presented at trial." Calderon, 118 S. Ct. at 1503 (citing Schlup, 513 U.S. at 324). A reviewing court must evaluate the new evidence alongside any other admissible evidence of the defendant's guilt, see Bousley v. United States, 118 S. Ct. 1604, 1611-12 (1998), and may grant relief only where "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray v. Carrier, 477 U.S. 478, 496 (1986). Evaluated under this "demanding" standard, see Calderon, 118 S. Ct. at 1503, Wilson's claims of actual innocence must fail.

We cannot accept Wilson's claim that he is actually innocent because his voluntary intoxication caused him to become temporarily

_____

and found them meritless; its failure to hold an evidentiary hearing "in no way indicates that the court slighted these claims." Id. In light of our conclusion that an evidentiary hearing was unnecessary, we need not decide whether AEDPA independently might bar a hearing on these claims. See 28 U.S.C. § 2254(e).

12

insane. Voluntary intoxication generally does not provide a defense unless it induces a permanent insanity. See Little v. Commonwealth, 175 S.E. 767, 769 (Va. 1934); Downing v. Commonwealth, 496 S.E.2d 164, 166 (Va. Ct. App. 1998). Here Dr. Fisher found "little" evidence that Wilson suffered from a "permanent" disorder and merely found it possible that Wilson might have been suffering from a "temporary condition" at the time he committed the offense. Even had a juror been apprised of Dr. Fisher's report, he would have had almost no reason to conclude that voluntary intoxication had produced a permanent insanity in Wilson.

Wilson's claim that he lacked the mens rea to commit an intentional crime is equally unavailing. Virginia does recognize that "when a person voluntarily becomes so intoxicated that he is incapable of deliberation or premeditation, he cannot commit a class of murder that requires proof of a deliberate and premeditated killing." Wright v. Commonwealth, 363 S.E.2d 711, 712 (Va. 1988) (citations omitted). Nonetheless, a reasonable juror aware of Dr. Fisher's assessments still could have found Wilson guilty beyond a reasonable doubt. The jury heard Altomika and Takeshia testify how Wilson demanded that they go upstairs, how he separated them from Jacqueline, how he threatened to kill Jacqueline if the girls did not open the door after escaping their bindings, and how he ordered Jacqueline to find her car keys. The jury also heard testimony that Wilson drove away in Jacqueline's car. A reasonable juror surely could find this course of conduct to be the product of a mind capable of deliberation and premeditation. See Mathenia v. Delo, 99 F.3d 1476, 1481-82 (8th Cir. 1996) (rejecting actual innocence claim that defendant was incapable of deliberation), cert. denied sub nom. Mathenia v. Bowersox, 117 S. Ct. 2518 (1997); Nave v. Delo, 62 F.3d 1024, 1033 (8th Cir. 1995) (same). Furthermore, the jury already was aware of Wilson's intoxication. It heard a police officer, who found Wilson shortly after the crime, testify that Wilson was acting peculiar and suggest that Wilson might have been "high." It also heard Wilson testify that he had been at a bar with his brother before the offense and had gone to Jacqueline's home to smoke some Kooleys -- cigarettes laced with cocaine. In light of the fact that the jury found Wilson guilty despite its awareness of his intoxication, Wilson has failed to show that, even with Dr. Fisher's report, it is more likely than not that no reasonable

13

juror would have convicted him. See Nave, 62 F.3d at 1033. Thus, Wilson's claims of actual innocence must fail.

IV.

Wilson next claims that there was insufficient evidence to convict him of attempted rape. Since Wilson's indictment listed attempted rape as the predicate offense to capital murder, Wilson uses this claim indirectly to attack his death sentence as well. Finding ample evidence to support the conviction for attempted rape, both the Virginia Supreme Court on direct appeal and the federal district court on collateral review rejected this claim.

Though claims of insufficient evidence are cognizable on collateral review, a federal court's review of such claims is "sharply limited." Wright v. West, 505 U.S. 277, 296 (1992) (plurality opinion); see also Evans-Smith v. Taylor, 19 F.3d 899, 905 (4th Cir. 1994) ("The standard is obviously rigorous."). Federal review of the sufficiency of the evidence to support a state conviction is not meant to consider anew the jury's guilt determination or to replace the state's system of direct appellate review. Wright, 505 U.S. at 292. Thus, a defendant is entitled to relief only if "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979) (footnote omitted); see also George v. Angelone, 100 F.3d 353, 357 (4th Cir. 1996), cert. denied, 117 S. Ct. 854 (1997).

The Jackson standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n.16. In Virginia, the elements of attempted rape include a direct but ineffectual act toward its consummation and an intent to engage in sexual intercourse. E.g., Fortune v. Commonwealth, 416 S.E.2d 25, 27 (Va. Ct. App. 1992); Chittum v. Commonwealth, 174 S.E.2d 779, 781 (Va. 1970). In this case, Wilson has failed to show that no rational trier of fact could find him guilty of attempted rape.

Sufficient evidence supported the jury's conclusion that Wilson took an overt act toward consummation of the rape. On direct appeal, the Virginia Supreme Court found that Wilson's nudity, his isolating Jacqueline Stephens from the young girls, his forcibly binding Jac-

14

queline naked to her bed, and the presence of what appeared to be pubic hairs and semen on Jacqueline's body satisfied the overt act requirement. 452 S.E.2d at 674. Wilson challenges this finding on the ground that the Commonwealth failed to introduce evidence establishing that the white substance observed on Jacqueline's body was in fact semen and failed to prove that the pubic hairs recovered at the scene belonged to him. We are unpersuaded. Wilson's argument ignores the fact that a federal court reviewing the sufficiency of the evidence on collateral attack must consider the evidence in the light most favorable to the prosecution and must presume that the jury resolved any conflicts over the historical facts in the Commonwealth's favor. Wright, 505 U.S. at 296; Jackson, 443 U.S. at 319. In finding Wilson guilty of attempted rape, the jury clearly could infer that the white substance actually was semen and that the pubic hairs belonged to him.

Moreover, such physical evidence is not even necessary to show that Wilson took a direct act toward raping Jacqueline. See Fortune, 416 S.E.2d at 28; Granberry v. Commonwealth, 36 S.E.2d 547, 548 (Va. 1946). In Fortune, for example, the court found sufficient evidence of an overt act when the defendant removed his pants, exposed himself, forced the victim into a bedroom, and touched her breast during a struggle. 416 S.E.2d at 28. On this record, a jury could find that Wilson, like the defendant in Fortune, removed his clothes, exposed himself, forced Jacqueline into the bedroom and touched her at some point during the encounter, thereby committing a direct but ineffectual act in furtherance of raping her.

Sufficient evidence likewise supported the jury's finding that Wilson had formed the requisite intent to rape. The Virginia Supreme Court concluded that Wilson's actions along with Jacqueline's statement "Kenny, why you doing this to me? I go with Pinkey, why you doing this to me?" supported a finding of intent to rape. 452 S.E.2d at 674. Wilson essentially argues that this circumstantial evidence does not support a finding of intent to rape but, instead, shows only an intent to commit murder. We disagree. "In cases involving an attempt to commit a crime, the fact finder is often allowed broad latitude in determining the specific intent of the actor." Fortune, 416 S.E.2d at 27 (citing Ridley v. Commonwealth, 252 S.E.2d 313, 314 (Va. 1979)). A defendant's intent to commit rape may be shown

15

through circumstantial evidence, including the defendant's conduct and statements. Fortune, 416 S.E.2d at 27; Green v. Commonwealth, 292 S.E.2d 605, 608-09 (Va. 1982); see also Epperly v. Booker, 997 F.2d 1, 6 (4th Cir. 1993); Inge v. Procunier, 758 F.2d 1010, 1013 (4th Cir. 1985). In this case, in addition to the physical evidence, the jury heard testimony that Wilson was naked, took Jacqueline into a bedroom, and ordered Takeshia Banks to disrobe. Such conduct and statements are entirely "consistent with preparation for sexual intercourse" and "permitted the trier of fact to infer that [Wilson] was attempting to rape [Jacqueline]." Fortune, 416 S.E.2d at 27-28; see also Green, 292 S.E.2d at 608-09; Chittum , 174 S.E.2d at 781; Ingram v. Commonwealth, 66 S.E.2d 846, 851 (Va. 1951); cf. Tharrington v. Commonwealth, 346 S.E.2d 337, 339 (Va. Ct. App. 1986).

Wilson argues that, under Virginia law, when the state's proof of intent is entirely circumstantial, it must exclude every reasonable hypothesis of innocence. See Rogers v. Commonwealth, 410 S.E.2d 621, 627 (Va. 1991). But we have expressly declined to "adopt Virginia's stricter standard of review for sufficiency of the evidence" on collateral attack and held that the state was not required to exclude every reasonable hypothesis of innocence. Inge , 758 F.2d at 1014; see also Jackson, 443 U.S. at 326 (noting that prosecution not "under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt"). Thus, Wilson has failed to show that no rational trier of fact could have found proof that he was guilty of attempted rape beyond a reasonable doubt, and the district court properly rejected this claim. See Hawkins v. Lynaugh , 844 F.2d 1132, 1136 (5th Cir. 1988) (sufficient evidence of attempted rape); cf. Holdren v. Legursky, 16 F.3d 57, 62-63 (4th Cir. 1994) (sufficient evidence of sexual assault).

V.

Lastly, Wilson argues that the trial court should have instructed the jury about the actual effects of his life sentence. Specifically, he maintains the jury should have known that he would not be eligible for parole for twenty-five years. He claims that both the Eighth Amendment's guarantee against cruel and unusual punishment and

16

the Fourteenth Amendment's guarantee of due process entitled him to such an instruction. We disagree.

We previously rejected this precise argument in Peterson v. Murray. 904 F.2d 882 (4th Cir. 1990). Peterson held that a defendant was not constitutionally entitled to inform the jury that he would have been ineligible for parole for twenty years. Id. at 886-87. The plaintiff in Peterson, like Wilson, pressed this argument under both the Cruel and Unusual Punishment and Due Process Clauses. Peterson extended our earlier holding in Turner v. Bass , 753 F.2d 342, 353-54 (4th Cir. 1985), rev'd on other grounds sub nom. Turner v. Murray, 476 U.S. 28 (1986), which had rejected a similar argument based solely on the Due Process Clause.

Wilson attempts to evade the ruling in Peterson by arguing that the legal landscape fundamentally changed after the Supreme Court's decision in Simmons v. South Carolina, 512 U.S. 154 (1994). In Simmons, the Supreme Court held that a capital defendant, as a matter of due process, should be permitted to inform the jury that he is parole ineligible if the state argues that he presents a future danger. See id. at 171 (plurality opinion); id. at 178 (O'Connor, J., joined by Rehnquist, C.J., and Kennedy, J., concurring in the judgment); see also O'Dell v. Netherland, 117 S. Ct. 1969, 1971 (1997). The plurality opinion in Simmons repeatedly stressed the central importance of a defendant's parole ineligibility to its holding. See, e.g., 512 U.S. at 163-64. And Justice O'Connor's concurring opinion, which was joined by two other justices and "provid[ed] the dispositive votes necessary to sustain [the judgment]," O'Dell, 117 S. Ct. at 1974, observed that the Constitution did not require an instruction for parole-eligible defendants. See Simmons, 512 U.S. at 176 ("In a State in which parole is available, the Constitution does not require (or preclude) jury consideration of that fact.").

Simmons, thus, has not altered our decisions in Peterson and Turner to the extent they held that the Constitution does not entitle defendants to an instruction about when they would become eligible for parole. Simmons did not address whether the Eighth Amendment required an instruction on parole ineligibility, see 512 U.S. at 162 n.4, so it can hardly be read to require such an instruction for parole-eligible defendants. With respect to the Due Process Clause, this cir-

17

cuit has observed that Justice O'Connor's opinion, which expressly confined the case to situations of parole ineligibility, should be read as expressing its essential holding. See Arnold v. Evatt, 113 F.3d 1352, 1363 n.65 (4th Cir. 1997), cert. denied sub nom. Arnold v. Moore, 118 S. Ct. 715 (1998); Townes v. Murray, 68 F.3d 840, 849 (4th Cir. 1995). In Arnold, consistent with this reading of Simmons, we held that a defendant was not entitled to inform the jury about the actual effects of a life sentence or death sentence since, like Wilson, he was not parole ineligible. 113 F.3d at 1363. Other courts share our reading of Simmons and hold that it does not entitle a defendant to an instruction about when he would become eligible for parole. See, e.g., Montoya v. Scott, 65 F.3d 405, 416-17 (5th Cir. 1995); Allridge v. Scott, 41 F.3d 213, 222 (5th Cir. 1994); Ingram v. Zant, 26 F.3d 1047, 1054 n.5 (11th Cir. 1994) (per curiam). In sum, neither the Eighth Amendment nor the Due Process Clause requires the instruction on parole eligibility sought by Wilson.

VI.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

MICHAEL, Circuit Judge, concurring in part and concurring in the judgment:

I concur in the result the majority opinion reaches, and I join in its reasoning, except for parts II and V. I disagree with the majority's suggestion in part II.A. that the Due Process Clause does not provide an indigent criminal defendant with the right to a court-appointed psychiatrist (or clinical psychologist) who does not commit malpractice when examining the defendant. I also have an uneasy feeling that part II.B., which holds that counsel was not ineffective for failing to second-guess the conclusions of the defense psychologist, might be misinterpreted to mean that counsel is not required to seek a second opinion when a court-appointed psychologist conducts a wholly inadequate mental examination. Further, although I agree with the majority's conclusion in part V that the petitioner in this case had no due process right to inform the sentencing jury when he would become

18

eligible for parole, I cannot agree with the majority's characterization of the precedents governing this issue. I therefore write separately to express my views on the right to a psychiatrist, to emphasize that a defense lawyer retains at least some responsibility for ensuring that the psychiatrist does his job, to offer my interpretation of the cases dealing with the parole eligibility issue, and to explain why I would affirm the district court's denial of the petitioner's habeas claims.

I.

I have no quarrel with the majority's observation that "[t]he Constitution does not entitle a criminal defendant to the effective assistance of a [court-appointed] expert [psychiatric] witness," ante at 5. That is a correct statement of the law in this circuit. See Waye v. Murray, 884 F.2d 765, 766-67 (4th Cir. 1989); see also Pruett v. Thompson, 996 F.2d 1560, 1573 n.12 (4th Cir. 1993); Poyner v. Murray, 964 F.2d 1404, 1418-19 (4th Cir. 1992). However, the petitioner, Kenneth Wilson, does not say that he was entitled to "effective assistance" from his court-appointed clinical psychologist, Dr. Don Killian. Wilson's argument is more circumscribed. He does not claim that he can challenge every aspect of Dr. Killian's performance as"ineffective." Rather, Wilson maintains only that Dr. Killian was required to provide him an "appropriate" examination. This rule, Wilson argues, is compelled by Ake v. Oklahoma, 470 U.S. 68 (1985), which held that an indigent defendant has a due process right to psychiatric assistance. See id. at 83 ("[T]he State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination . . . ."). According to Wilson, Ake required Dr. Killian to provide him with a sanity examination that met the minimum standard of care for clinical psychologists. [1] Wilson also

_____

[1] None of our cases have dealt with a claim that a court-appointed psychiatrist (or clinical psychologist) committed malpractice in his examination of the defendant. Rather, we have addressed a claim that a psychiatrist should have performed better on the witness stand, see Waye, 884 F.2d at 766, 767, a claim that defense counsel could have chosen a better-qualified psychiatrist to examine the defendant, see Pruett, 996 F.2d at 1573 n.12, 1574 n.13, a claim that counsel should have shopped for a psychiatrist who would give a different diagnosis, see Washington v. Murray, 952 F.2d 1472, 1481 (4th Cir. 1991), and a claim that counsel

19

claims that his evidence shows that Dr. Killian's examination failed to meet that standard. I agree with both arguments. **2** However, I would deny Wilson's claim for other reasons.

The majority expresses some doubt about (but does not squarely reject) Wilson's claim that he was entitled to an appropriate examination, see ante at 5-6. The majority's doubt is based on the point that Ake does not "guarantee[ ] a particular substantive result," ante at 6. Of course, Ake does not require that a state provide an indigent defendant with a psychiatrist who will come to a favorable conclusion, cf. Poyner, 964 F.2d at 1419, or look for evidence of specific psychiatric afflictions, see Pruett, 996 F.2d at 1573, or make the "correct" diagnosis, see, e.g., Washington, 952 F.2d at 1482. But Wilson does not claim that Dr. Killian should have provided more favorable results, or looked for specific mental disorders, or rendered the "correct" conclusion regarding his (Wilson's) sanity. Wilson argues only that Ake guaranteed him an examination that was not so flawed that it constituted malpractice. I agree with Wilson's reading of Ake. Due process required Dr. Killian to give Wilson a thorough examination that met the minimum standard of care set by the clinical psychology profession.**3**

_____

should have employed a psychiatrist who was more adept at developing imaginative theories of mitigation, see Poyner , 964 F.2d at 1418, 1419. Thus, none of our cases control the narrow issue raised by Wilson, whether an indigent defendant has a right to an appropriate examination that meets the standard of care set by the psychiatric profession.

**2** Further, even if Ake does not give an indigent defendant a right to an "appropriate examination" that is independent of the right to effective assistance of counsel, I would hold that the Constitution places a heightened responsibility on counsel to ensure that the defendant receives an appropriate examination. See part II.A., below.

**3** This would have included a careful analysis of Wilson's medical records, compilation of an accurate social history (including any history of mental illness or substance abuse), and a complete mental and physical examination (employing whatever diagnostic tests were appropriate under the circumstances). See generally Comprehensive Textbook of Psychiatry/IV 543-48, 836-37 (Harold I. Kaplan & Benjamin J. Sadock eds., 4th ed. 1985).

The majority appears to disagree. Ake's focus, the majority reminds us, was on "ensuring a defendant access to a psychiatrist or psychologist." Ante at 6. This statement, while true, gets us nowhere. Of course, Ake did not explicitly decide whether an indigent defendant is entitled to a court-appointed psychiatrist whose psychiatric examination does not constitute malpractice. The case did not present that question because the defendant there received no sanity examination whatsoever. See Ake, 470 U.S. at 72-74. However, Ake's reasoning suggests a broader rule, that a court-appointed psychiatrist cannot commit malpractice when examining a defendant. As Ake explains, the right to a court-appointed psychiatrist is a logical extension of the right-to-counsel cases, which recognize that "meaningful access" to justice under the Due Process Clause means providing all of the "tools" necessary for an adequate defense. See id. at 76-77 (citing Gideon v. Wainwright, 372 U.S. 335 (1963); Douglas v. California, 372 U.S. 353 (1963); Strickland v. Washington , 466 U.S. 668 (1984); Evitts v. Lucey, 469 U.S. 387 (1985)). Ake 's reference to these cases, which recognize that the right to counsel is really the right to effective assistance of counsel, was no accident: the Ake Court meant for the right to a psychiatrist to operate somewhat like the right to counsel.**4** By explaining that a psychiatrist was a defense"tool," the Ake court meant for that tool to be fully functional. Cf. Harris v. Vasquez, 949 F.2d 1497, 1530 (9th Cir. 1990) (as amended Aug. 21, 1991) (Noonan, J., dissenting) ("The emphasis on tools is an emphasis on function. A non-functioning tool is useless; so is a non-functioning psychiatrist.") Thus, although Ake's"precise holding" gives an indigent defendant access to a psychiatrist, see ante at 6, Ake's reasoning is not so confined. And none of the majority's citations to Ake suggest otherwise.**5**

_____

**4** However, I believe that the Ake right cannot and should not function exactly like the right to effective assistance of counsel. As I explain in part II.A., below, I would recognize the existence of a narrow right to an appropriate examination and require that all other challenges to the psychiatrist's performance as a member of the defense team be brought as challenges to the adequacy of counsel's representation. Due process provides defendants with a right to an appropriate examination, see Ake, 470 U.S. at 83, but it provides no right to effective assistance of a psychiatrist generally, see Waye, 884 F.2d at 767.

**5** If the Ake Court had viewed the right to a psychiatrist as providing mere access to a psychiatrist, I expect that more Justices would have

21

We do not have to scrutinize <u>Ake</u>'s reasoning closely to understand why the due process right to a court-appointed psychiatrist necessarily encompasses the right to an <u>appropriate</u> examination by that psychiatrist. Simple logic dictates that without the latter right the former is meaningless. An example is helpful here. In the majority's view, a state apparently would fulfill its duty under <u>Ake</u> by appointing a competent psychiatrist (with all the right credentials) to examine a defendant, even if the psychiatrist performs a wholly inadequate examination. Let us say, for example, that a psychiatrist saw the defendant for only five minutes, in which time the doctor's only "diagnostic tests" were to ask the defendant his name and ask him to count to 100.**6** This "examination," where the psychiatrist plainly did not do his job, cannot be all that <u>Ake</u> guarantees. Such an examination is essentially the same as no examination at all. It is a denial of <u>access</u> to a psychiatrist, just as in <u>Ake</u>. <u>See Harris</u>, 949 F.2d at 1531 (Noonan, J., dissenting) ("Ineffective psychiatric aid is no aid at all."). Unless <u>Ake</u>'s guarantee of the assistance of psychiatrist is an empty one, due process must require that a court-appointed psychiatrist provide an indigent defendant with an <u>adequate</u> mental examination. <u>Cf. Strickland</u>, 466 U.S. at 685-86 (explaining why the right to counsel is the right to <u>effective</u> assistance of counsel); <u>Evitts</u>, 469 U.S. at 394-96 (same). Therefore, I would hold that a defendant has the right to an "appropriate" mental examination, just as <u>Ake</u> said. <u>See Starr v. Lockhart</u>, 23 F.3d 1280, 1289-90 (8th Cir. 1994) ("As <u>Ake</u> explains, due process requires access to an expert who will conduct, not just any, but an appropriate examination."); <u>see, e.g., Ford v. Gaither</u>, 953 F.2d 1296, 1298-99 (11th Cir. 1992) (holding that the state-appointed psychiatrist's examination was inadequate under <u>Ake</u> when the psy-

_____

joined the Chief Justice's concurring opinion in that case. <u>See Ake</u>, 470 U.S. at 87 (Burger, C.J., concurring in the judgment) (reading the majority opinion to address only the narrow question of whether a capital defendant may be denied "any opportunity whatsoever" to consult with a psychiatrist). However, no other Justice joined the Chief Justice's opinion.

**6** This hypothetical may be extreme, but I can imagine many other situations in which a psychiatrist might perform a grossly inadequate examination. The doctor could botch the exam (since no one is perfect) or he could be tired, be having a bad day, or simply be in a hurry to make some appointment outside the office.

chiatrist simply interviewed the defendant about the events on the day of the crime); cf., e.g., Cowley v. Stricklin, 929 F.2d 640, 644-45 (11th Cir. 1991) (holding that the aid provided by the defense psychiatrist failed to satisfy Ake's mandate when the psychiatrist did not examine the defendant).**7**

The majority does not squarely decide this issue, though. Instead, it says that "[e]ven if Ake's use of the term `appropriate' suggests that an examination must satisfy some minimal level of professional competence, Dr. Killian has clearly satisfied it here." Ante at 8; see also ante at 6 (explaining why the examination supposedly met the standard of care). Therefore, the Ake question appears to be left for another day.

I cannot agree with the majority that Dr. Killian performed an "appropriate" examination. This is fact-finding, and the record does not support it. Dr. Killian's ninety-minute interview of Wilson (in which Dr. Killian did not perform a single diagnostic test or consult any of Wilson's medical records) and Dr. Killian's half-page "report" (which

---

**7** The criminal justice system would not be put under strain if we were to recognize a defendant's right to a psychiatrist who does his job. That psychiatrists sometimes disagree with each other about diagnoses is no reason to worry that the finality of convictions will be undermined, see ante at 5. Implementing a malpractice standard would not allow a defendant to challenge his conviction just because some other psychiatrist disagrees with the court-appointed psychiatrist's diagnosis. Rather, the petitioner would have to prove (with the assistance of a new psychiatrist) that the court-appointed expert's examination totally failed to meet the relevant standard of care. Of course, such claims would rarely succeed. Just as with the claim of ineffective assistance of counsel, a defendant will rarely be able to prove that his psychiatrist conducted an examination that was constitutionally deficient.

I also am not concerned that allowing a defendant to challenge his psychiatrist's performance will lead to "an endless battle of ... experts," ante at 5. Since there is no right to the effective assistance of counsel on habeas review, see Pennsylvania v. Finley, 481 U.S. 551, 555 (1987), there surely would be no right under Ake to an appropriate examination on habeas review. Also, the limitations on successive habeas petitions will ensure that defendants do not try to raise this claim repeatedly with a succession of experts.

23

summarily concluded that Wilson was sane at the time of his offense) did not "clearly" meet the standard of care. In fact, my reading of a report by Dr. Brad Fisher, a clinical psychologist who examined Wilson in 1997, suggests that Dr. Killian's May 1993 examination of Wilson fell short of the standard. Dr. Fisher's examination of Wilson is a model of professional care, in sharp contrast to Dr. Killian's examination. Dr. Fisher interviewed Wilson, performed a full battery of tests on him, studied (among other things) Wilson's medical records, and obtained a full social and medical history (for which he consulted sources independent of Wilson). Further, Dr. Fisher reviewed Dr. Killian's notes and report from the May 1993 examination. According to Dr. Fisher, "Dr. Killian drew his conclusions without conducting a complete or comprehensive investigation" of Wilson's mental health history. Further, Dr. Fisher wrote, Dr. Killian should have studied the "considerable available data" concerning Wilson's mental condition, including Wilson's medical records and history of substance abuse, "rather than basing opinions strictly on his interview." "At a minimum," Dr. Fisher said, Dr. Killian should have considered information regarding "the level of drugs in Mr. Wilson's system" at the time of the offense. Although the Constitution did not give Wilson the right to an ideal examination like the one provided by Dr. Fisher, it required an examination and diagnosis that reflected an accepted minimum of skill and care. Dr. Fisher's report suggests that Dr. Killian's abbreviated interview of Wilson did not meet the relevant standard of care because Dr. Killian failed follow the bare minimum of procedures necessary for an adequate sanity examination. This was enough to create an issue of fact about whether Dr. Killian's May 1993 examination of Wilson constituted malpractice.[8]

_____

[8] If the majority is suggesting, ante at 8, that Dr. Killian conducted a second mental examination of Wilson, I disagree. Dr. Killian did not perform a second examination of Wilson during their brief second meeting in November 1993. In any event, whether Wilson had a second examination is irrelevant to his claim that Dr. Killian committed malpractice in his first examination in May 1993. After the first examination Dr. Killian concluded that Wilson was sane at the time of the offense. This examination was entirely unrelated to the second meeting between Dr. Killian and Wilson, which was scheduled by Wilson's counsel in an attempt to develop mitigation evidence for the sentencing phase of Wilson's trial.

Despite my disagreement with the majority on the Ake issue, I agree that Wilson's petition should be denied. I would hold that Wilson's Ake claim was procedurally defaulted. Wilson argues on appeal that he is not barred from raising the Ake claim because his default was excused. Even if this excuse was valid (it is not; see part II.B.), I would not allow Wilson to raise it to negate the procedural default of his Ake claim. Wilson waived this excuse by failing to mention it in district court. There, Wilson did not respond to the Commonwealth's argument that he procedurally defaulted his Ake claim by asserting that any default was excused. Rather, Wilson argued that he had presented his Ake argument in state court.

Of course, we have the discretion to address issues not raised below to prevent a miscarriage of justice. However, I am convinced that no injustice would result from the refusal to address Wilson's Ake claim. First, as the majority ably explains, Wilson failed to make out a claim of actual innocence. See ante at 12-13. Thus, the failure to address the claim would not result in the execution of an innocent man. Second, as the majority correctly concludes, the violation of Wilson's Ake right was harmless beyond a reasonable doubt. Even if Dr. Killian had provided Wilson with an appropriate mental examination, there is no reason to believe that the doctor would have made a different assessment of Wilson's sanity. See ante at 10-11. Third, Wilson has not convinced me that he would have avoided a death sentence if Dr. Killian's first examination had been appropriate. Dr. Killian was charged with assessing Wilson's sanity in that examination, not with finding mitigating evidence. An appropriate examination might have unearthed some mitigating evidence, but Wilson has not said what that might be or how it might have affected his sentence. Therefore, I see no injustice in applying the normal waiver rule to bar Wilson from claiming, for the first time on appeal, that his procedural default was excused.

II.

As an alternative to his Ake claim, Wilson argues that his counsel was constitutionally ineffective under Strickland v. Washington, 466 U.S. 668 (1984), for failing to (1) explore adequately an insanity defense and (2) file a timely request for a second mental examination (to develop mitigation evidence in anticipation of sentencing). The

25

majority rejects Wilson's first claim, reasoning that "[t]o be reasonably effective, counsel was not required to second-guess" Dr. Killian's conclusion from the May 1993 examination that Wilson was not insane at the time of the offense. Ante at 10. The majority rejects Wilson's second claim on the ground that counsel's decision not to seek a second examination sooner was not unreasonable because "Dr. Killian already had concluded that Wilson was sane at the time of the offense." Ante at 10 n.2. I disagree with both of the majority's conclusions. For the first claim, our main focus ought to be on the psychologist's examination, not on counsel's appraisal of it. Further, defense counsel was ineffective in preparing Dr. Killian for the first examination and, possibly, for failing to obtain a second opinion. For Wilson's second claim, defense counsel was ineffective for not filing a timely request for a second examination. Still, both claims were procedurally defaulted.

A.

While I would recognize a right to an appropriate mental examination under Ake, the majority has studiously avoided doing that here. The majority seems to say that any Ake right can only be enforced through a claim of ineffective assistance of counsel. The majority goes on to hold that the failure of Wilson's trial counsel to second-guess Dr. Killian's sanity evaluation was not constitutionally ineffective. Ante at 9-10. I read the majority's holding to be based solely on the facts of this case: since Dr. Killian's examination was appropriate, see ante at 8, there was no reason for defense counsel to second-guess the doctor's methods or his conclusion that Wilson was sane at the time of the offense.[9] Therefore, I do not read the majority opinion as creating a general rule that defense counsel is never required to second-guess the court-appointed psychiatrist's mental evaluation of the defendant. Such a holding would, if there was no independent Ake right to an appropriate examination, effectively insulate a psychiatrist's poor performance from review and leave an indigent defendant with no recourse when he received an inappropriate mental examination. And that is not the law. Even if I am incorrect to assert (in part I) that Ake grants indigent defendants an independent right to an

_____

[9] Of course, I disagree with the majority's finding that Dr. Killian's examination was appropriate. See part I, above.

26

appropriate mental examination, a defendant <u>must</u> be able to vindicate his <u>Ake</u> right to an appropriate examination through a claim of ineffective assistance of counsel.

It is well established that substandard performance by a court-funded psychiatrist (or clinical psychologist) can be the basis of a claim of ineffective assistance of <u>counsel</u> if, by failing to ensure that the psychiatrist performed adequately, counsel's performance fell outside of the broad range of conduct that constitutes reasonably effective assistance. <u>See, e.g.</u>, <u>United States v. Kauffman</u>, 109 F.3d 186, 190-91 (3rd Cir. 1997); <u>Kenley v. Armontrout</u>, 937 F.2d 1298, 1303-08 (8th Cir. 1991); <u>Elledge v. Dugger</u>, 823 F.2d 1439, 1445-47 (11th Cir.), <u>modified in part</u>, 833 F.2d 250 (11th Cir. 1987) (withdrawing unrelated portion of the opinion); <u>see also Poyner v. Murray</u>, 964 F.2d 1404, 1419 (4th Cir. 1992); <u>Washington v. Murray</u>, 952 F.2d at 1472, 1481 (4th Cir. 1991). A lawyer is expected to perform competently in all aspects of his representation of a criminal defendant, including (if the case requires) the assertion of an insanity defense at trial or the presentation of mitigation evidence at sentencing. An <u>Ake</u>-mandated psychiatrist is an important tool for effective advocacy in both situations, so defense counsel is expected to use this tool with appropriate skill. To do this defense counsel must, to some extent, ensure that a court-funded psychiatrist does his job. This requires that a defense lawyer learn something about how a psychiatrist can assist him in defending a criminal defendant. Thus, the burden of ensuring that a psychiatrist performs adequately for the defense team (as an advisor, consultant, witness, etc.) falls on counsel, just as the burden of ensuring that any other witness or member of the defense team performs adequately falls on counsel. Counsel is the expert on conducting a criminal defense, after all.

Lawyer oversight is unlikely to result in full effectuation of <u>Ake</u>'s mandate, however. <u>Ake</u> held that due process requires an indigent defendant be provided with "access to a competent psychiatrist who will [1] conduct an appropriate examination and [2] assist in evaluation, preparation and presentation of the defense." <u>Ake v. Oklahoma</u>, 470 U.S. 68, 83 (1985). But a lawyer usually can be expected to guarantee only the second half of this mandate. As a trained advocate a criminal defense lawyer is expected to know how to defend an accused in a competent manner, by (for example) planning an insanity

27

defense, investigating the defendant's background for mitigating evidence, and adducing psychiatric testimony. So, a lawyer can be expected to know when an expert's conclusions would be favorable to the defense, to understand what strategies of mitigation might impress a jury, and to ensure that the psychiatrist's testimony is presented in a compelling fashion. Still, even the most diligent and informed defense lawyer will often be hard pressed to second-guess the psychiatrist's methods and diagnosis in an examination of the defendant's sanity. This is because the mental examination is a part of the psychiatrist's job that is totally outside the lawyer's professional competence. A psychiatrist is uniquely qualified to perform a psychiatric examination and render a diagnosis of the defendant's mental condition. As a result, while defense counsel can be expected to have the know-how to ensure that the court-appointed psychiatrist "assist[s] in evaluation, preparation, and presentation of the defense," counsel rarely will be qualified to determine whether the psychiatrist has "conduct[ed] an appropriate examination." Unless the psychiatrist's report or conclusions are obviously incoherent, inaccurate, incomplete, or the like, a lawyer cannot and should not be expected to second-guess the psychiatrist's methods and diagnosis. Cf., e.g., Washington, 952 F.2d at 1481-82 (explaining that, on the facts of that case, defense counsel could not have been reasonably expected to second-guess the psychiatrist's diagnosis).

The majority does not distinguish between the lawyer's role and the psychiatrist's role, however. Rather, the majority would place the full burden of spotting psychiatrist malpractice on defense counsel by putting counsel in charge of ensuring that the Ake right is protected. This is a questionable arrangement. The Ake right, derived from the Due Process Clause, is separate from and independent of the Sixth Amendment right to effective assistance of counsel. The former right was first recognized in Ake; the latter right has been with us much longer, since Gideon v. Wainwright, 372 U.S. 335, 345 (1963), and has for years governed a lawyer's use of a psychiatrist as part of the defense team, see, e.g., United States v. Edwards, 488 F.2d 1154, 1163-64 (5th Cir. 1974). Further, these two rights may apply in different circumstances. While I would recognize an independent Ake right where (as here) the defendant's mental examination is performed by a court-appointed psychiatrist, I am less certain (and I need not say) whether there is an Ake right to an appropriate examination separate

28

from the right to effective assistance of counsel when counsel uses a hand-picked expert, paid for by the defense. Moreover, as I have explained, these two rights create two different standards of conduct: the right to counsel deals with lawyer malpractice while the right to a psychiatrist deals with psychiatrist malpractice. Lawyers are not trained as psychiatrists, and they cannot be expected to have the same working knowledge of psychiatry as an expert in the field. A lawyer cannot be expected to recognize a psychiatrist's malpractice in all cases where another psychiatrist would. Thus, the standard for lawyer malpractice in evaluating a court-appointed psychiatrist's examination is necessarily lower than the standard for psychiatrist (or clinical psychologist) malpractice in conducting the examination. Therefore, it would be a dilution of the Ake right to say that an indigent defendant must receive a mental examination that does not constitute psychiatrist malpractice -- but only if the examination was so inadequate that the failure to recognize the psychiatrist's malpractice constituted lawyer malpractice.

The majority apparently recognizes that, due to lack of medical and technical expertise, defense counsel often will have difficulty finding fault in a court-appointed psychiatrist's examination or in challenging its conclusions. Cf. ante at 11 (citing Washington, 952 F.2d at 1482). However, the majority seems content to leave the entire burden of protecting the Ake right on counsel. If protection of the Ake right does fall entirely on defense counsel, then counsel will be expected to do better than I have just described in evaluating the court-appointed psychiatrist's mental examination. In order to be effective, counsel will have to do some homework and know much more than any layman about the symptoms and effect of various mental disorders. Counsel also will have to study the psychiatrist's report carefully (and ask follow-up questions if necessary) to make sure he understands its conclusions and the doctor's reasons therefor (just as counsel would if he were using the report to put on an insanity defense). Further, counsel will have to request a second opinion when he has any reason to believe that the psychiatrist bungled the job. Only such heightened vigilance will allow counsel to ensure that the psychiatrist has conducted an appropriate mental examination of the defendant. In my view such heightened vigilance is necessary for counsel to discharge his duty to effectively represent his client.

29

I would prefer a different route, however. I would not give defense counsel the whole burden of ensuring that the psychiatrist's examination is appropriate. I would give this task, which only a psychiatrist is properly qualified to do, to the psychiatrist. This would create a division of labor that best effectuates both parts of Ake's mandate. The psychiatrist, the expert on mental examinations, would be responsible for providing the "appropriate examination," Ake, 470 U.S. at 83, while the lawyer, the expert at defending the accused, would be responsible for ensuring that the psychiatrist "assist[s] in the evaluation, preparation, and presentation of the defense," id. This rule also squares with the rule I endorse in part I, that there is a constitutional right to an appropriate examination from the psychiatrist but no general right to effective assistance of a psychiatrist. Further, this rule best reconciles our cases, which say that counsel is responsible for ensuring that the psychiatrist assists in the defense, see Poyner, 964 F.2d at 1418, but also imply that counsel cannot normally be expected to second-guess a psychiatrist's diagnosis, cf. e.g., Washington, 952 F.2d at 1481-82. (Of course, in those infrequent cases where the psychiatrist's examination is so flawed that any competent defense lawyer should notice, both the lawyer and the psychiatrist would be responsible.)

Since I would place the brunt of the burden of ensuring that a court-appointed psychiatrist's examination was appropriate on the psychiatrist (or clinical psychologist), not on counsel, I do not agree that the central question before us here is whether counsel was reasonable to rely on Dr. Killian's report, see ante at 9-10. The key question we should ask is whether Dr. Killian's first examination was appropriate. It was not, assuming that the facts alleged in Wilson's petition are true. See part I, above.

Our inquiry does not end there, however. As I have said, in some cases defense counsel's failure to recognize a court-appointed psychiatrist's obvious malpractice and request a second opinion can constitute ineffective assistance of counsel.[10] Further, counsel can be ineffective for causing the psychiatrist to perform an appropriate examination, by (for example) failing to provide the psychiatrist with

_____

[10] This would, I believe, give rise to two independent constitutional violations: a violation of Ake and a violation of Gideon.

30

access to all the materials necessary for an adequate examination. Here, Wilson's petition suggests that trial counsel was ineffective for both reasons. First, despite a court order to provide Dr. Killian with all "available psychiatric, psychological, medical or social records," counsel did not provide Dr. Killian with access to any relevant records. Counsel did not provide Dr. Killian with hospital records which showed that, at the time of Wilson's arrest, he was suffering from rhabdomyolysis, a condition produced by severe drug intoxication. Nor did counsel provide Dr. Killian with any documentation of Wilson's history of substance abuse. These records were obviously essential to a proper determination of Wilson's mental condition at the time of the offense, and counsel was ineffective for failing to obtain them for Dr. Killian. Second, I am not sure that it was reasonable for defense counsel to decide against an insanity defense (or at least, to decide against consulting a second clinical psychologist) based on Dr. Killian's report. Here, even a layman might have questioned the conclusions reached by Dr. Killian's short examination and conclusory report.**11**

However, even if trial counsel was ineffective with regard to Wilson's May 1993 examination, Wilson's claim does not succeed. First, Wilson did not argue in state court that trial counsel should have obtained a second mental examination, and this procedural default was not excused. See part II.B. Second, even if trial counsel was ineffective for failing to provide Dr. Killian with Wilson's medical records, Wilson suffered no prejudice from that mistake. Wilson has not proved that Dr. Killian would have testified that he was insane if the doctor had performed an appropriate first examination. See ante at 10-11.

_____

**11** I also cannot agree that counsel "reasonably chose not to develop a mental health defense at trial" because that defense was inconsistent with Wilson's testimony that he did not commit the crime, see ante at 10. We should not speculate that if Dr. Killian had conducted an appropriate examination, defense counsel would have decided not to put on an insanity defense.

31

B.

The majority also rejects Wilson's claim that defense counsel's failure to obtain a second mental examination constituted ineffective assistance, reasoning that no second examination was needed because Dr. Killian concluded that Wilson was sane. See ante at 10 n.2. I disagree. Even if counsel thought that Wilson was sane, counsel ought to have requested mitigation evidence from a psychologist. Dr. Killian's May 1993 examination of Wilson dealt with just one potential mitigating factor, Wilson's mental state. However, a second psychiatric evaluation could have unearthed other kinds of mitigating information about Wilson (such as his childhood exposure to physical abuse) that had little to do with his sanity. (Here, defense counsel admitted that a second examination by Dr. Killian might uncover mitigating factors that would be helpful at Wilson's sentencing.) Thus, even if it was reasonable for counsel to decide, in reliance on Dr. Killian's report, not to obtain a further evaluation of Wilson's mental state, see, e.g., Gilbert v. Moore, 134 F.3d 642, 654-55 (4th Cir. 1998), petition for cert. filed, No. 97-9198 (U.S. May 19, 1998), that was no reason for counsel to forego a second psychiatric evaluation.

I would hold that counsel erred by waiting to move for a second examination until two days after notifying the trial court that the defense planned to use mental health evidence at trial. Counsel's delay was error because under Virginia law the report from any second examination was discoverable by the prosecution as soon as the defense notified the court of its intent to use mental health evidence. See Va. Code Ann. § 19.2-264.3:1(D) (Michie 1995). The result of counsel's failure to request and obtain a second examination before notifying the court that the defense planned to use mental health evidence was that the defense team lost the opportunity to keep the results of Wilson's proposed second examination confidential. Once counsel realized this mistake and told Wilson that they would have to choose between a non-confidential examination and no examination at all, Wilson chose the latter option. Therefore, counsel's failure to obtain a confidential examination forced Wilson to forego a second examination and miss an opportunity to obtain psychiatric mitigation evidence at sentencing. This was ineffective lawyering.

The majority concludes that counsel's failure to obtain a confidential second examination was harmless, however, because "counsel

32

would have been required to disclose the results of such an examination" at trial anyway. Ante at 10 n.2. Again, I disagree. Wilson does not claim that he was harmed directly by the prospect of the report's disclosure. The harm from counsel's mistake, Wilson argues, was that it placed him between a rock and a hard place. Not knowing whether the examination would unearth helpful or harmful information for the defense, Wilson had to decide whether to forego the examination or take the chance that detrimental information would come out in the examination and fall into the Commonwealth's hands. And, although Wilson's decision to forego the second examination was voluntary, Wilson never would have had to make this tough decision if counsel had not put him in the unenviable situation of choosing a confidential examination or no examination at all. As a result of counsel's mistake, Wilson never had the opportunity to obtain a confidential psychological examination and decide whether to use that evidence on its own merit (based on an informed assessment of whether the benefit of the report outweighed any harm of its disclosure). This hindered Wilson's ability to develop mitigating evidence for sentencing.

Despite the merit of Wilson's ineffective assistance of counsel claim, I would hold that it is procedurally barred. In his state habeas petition, Wilson raised a substantive claim that he was denied a second examination, but he made no allegation that his problem arose due to bad lawyering. And, Wilson fails to convince me that this default is excused because the "state corrective processes" were either absent or inadequate to vindicate his right, see 28 U.S.C. § 2254(b)(1)(B) (1994). First, Wilson is simply wrong to say that he could not raise his claim in state habeas proceedings. In Virginia it is possible to raise an effective assistance of counsel claim in a habeas petition, even though the claim was not raised at trial or on appeal. Cf. Walker v. Mitchell, 299 S.E.2d 698, 699-700 (Va. 1983). Second, Wilson was not prejudiced when the state court did not notify habeas counsel of his appointment until two months prior to the deadline for filing the state petition. This mistake (which cut counsel's time to file in half) is troubling, but it did not prejudice Wilson's ability to file a state habeas petition. Indeed, Wilson's habeas counsel eventually filed a substantial petition. And, even if counsel was ineffective for filing to include all the points in the petition that Wilson wanted to raise, this does not excuse Wilson's procedural default. See Mackall

33

v. Angelone, 131 F.3d 441, 449 (4th Cir. 1997) (en banc), cert. denied, 118 S. Ct. 907 (1998).

III.

Finally, I would also reject Wilson's claim that he should have been allowed to inform the sentencing jury he was ineligible for parole for 25 years. As the majority explains, Simmons v. South Carolina, 512 U.S. 154 (1994), held that when the only alternative sentence to death is life in prison without the possibility of parole (and the state puts future dangerousness at issue), due process requires that the defendant be allowed to inform the sentencing jury that he is parole ineligible. See ante at 17 (citing Simmons, 512 U.S. at 178 (O'Connor, J., concurring in the judgment)). I agree with the majority's conclusion that Simmons does not control in Wilson's case because the alternative sentence to death for Wilson was life in prison with the possibility of parole after 25 years.**12** As a result, the extension of Simmons to Wilson's case would be a new rule. Cf. O'Dell v. Netherland, 117 S. Ct. 1969, 1971 (1997).

_____

**12 But cf. Brown v. Texas**, 118 S. Ct. 355, 355 (1997) (Stevens, J., respecting the denial of certiorari, joined by Souter, Ginsburg and Breyer, J.J.) (explaining that when the alternate sentence to death is life without the possibility of parole for 35 years, a rule prohibiting a defendant from informing the sentence jury of his parole ineligibility is in "obvious tension" with Simmons); id. at 356 n.2 (suggesting that "the life-without-parole option considered in Simmons is different in degree, but not in kind, from the sentencing options at issue here"); Simmons, 512 U.S. at 163 (Blackman, J., joined by Stevens, Souter and Ginsburg, J.J.) ("In assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant."); id. at 184-85 (Scalia, J., dissenting, joined by Thomas, J.) ("I see no more reason why the United States Constitution should compel the admission of evidence showing that . . . the defendant would be nonparolable, than that it should compel the admission of evidence showing that . . ., though under current law the defendant will be parolable in 20 years, the recidivism rate for elderly prisoners released after long incarceration is negligible. All of this evidence may be thought relevant to whether the death penalty should be imposed . . . .").

However, I hesitate to join the majority's discussion of Simmons. The majority is wrong to say that our decisions, either pre- or post-Simmons, govern the substantive question presented by Wilson.**13** Were we squarely presented with the question whether to extend the Simmons rule as Wilson argues, we would not be constrained from doing so by our own precedents. Further, I disagree with the majority's dicta discussing of the scope of Simmons . See ante at 17 ("[T]he Constitution does not entitle defendants to an instruction about when they would become eligible for parole."). We do not address the full scope of Simmons today, just the question before us. Thus, we do not decide whether in some other case Simmons might compel a sentencing court to allow a capital defendant to inform the jury of the true effect of an alternative sentence, even if that sentence has the possibility of parole. For example, if Wilson had established that his term of 25 years of parole ineligibility extended beyond his reasonable life expectancy, so that the actual effect of the sentence would be that the only alternative to death was life without any possibility of parole,

_____

**13** **Peterson v. Murray**, 904 F.2d 882 (4th Cir. 1990), held that the Eighth Amendment was not violated when a court refused to allow the defendant to inform the sentencing jury he was ineligible for parole for 20 years. See id. at 886-87. Peterson  did not decide the due process claim that Wilson makes. Turner v. Bass, 753 F.2d 342 (4th Cir. 1985), rev'd on other grounds sub nom., Turner v. Murray , 476 U.S. 8 (1986), and Townes v. Murray, 68 F.3d 840, 849 (4th Cir. 1995), cert. denied, 516 U.S. 1100 (1996), also did not address the question Wilson raises. Rather, they dealt with the issue of whether (pre- and post-Simmons, respectively) due process requires a sentencing court to instruct the jury, sua sponte, that a defendant is ineligible for parole. See Turner, 753 F.2d at 353-54; Townes, 68 F.3d at 849-50. Further, although the petitioner in Arnold v. Evatt, 113 F.3d 1352 (4th Cir. 1997), cert. denied, 118 S. Ct. 715 (1998), made a claim similar to the one Wilson makes (that the jury must be informed, at the defendant's request, of"the actual effect of a life sentence or a death sentence," id. at 1363), that case did not explicitly decide the issue Wilson asks us to decide. The Arnold court said that, on the record before it, the defendant had not showed that he was ineligible for parole. Id. Although the Arnold court did not say what the alternative sentence to death had been, we can assume that the petitioner there failed to show that he was parole ineligible at any time after his conviction. Thus, Arnold is distinguishable from this case because Wilson was parole ineligible for 25 years.

that might have brought Wilson's case within the rule of <u>Simmons</u>. Wilson has not made this argument, so I have no difficulty in rejecting his <u>Simmons</u> claim.