# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## Alphonso Ingram v. Commonwealth of Virginia.

October 8, 1951.

Record No. 3873.

Present, All the Justices.

The opinion states the case.

*Reuben E. Lawson,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General,* and *Frederick T. Gray, Assistant Attorney General,* for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

Alphonso Ingram, plaintiff in error, a young Negro man twenty years of age, has been convicted of an attempted rape, and sentenced to thirty years in the penitentiary in accordance with the verdict of a jury. Section 8-491, Code of Virginia, 1950.

He asks us to reverse the judgment against him on the sole ground that the evidence was insufficient to justify the jury in finding that he attacked the prosecutrix with the intent to commit rape. His assignments of error relating to the refusal of the trial court to give certain instructions were abandoned at the bar of this court.

The evidence of the Commonwealth shows the following facts:

On the night of August 14, 1950, Mrs. Beasley, a young white woman, eighteen years of age, was alone, except for the presence of her month-old daughter, at her home in Montgomery county, Virginia, on the outskirts of the city of Radford. Her husband, M. H. Beasley, left their home about 2:30 that afternoon to go to his employment at the Radford Arsenal, where he worked on the 4:00 p. m. to midnight shift. Between 8:30 and 8:45 p. m., when Mrs. Beasley was in bed asleep, she was awakened by a knock on her front door. The knock was very soft, similar to that usually made by her husband upon his return home. Dressed in her night clothes, she arose, put on a robe, turned on the lights in her kitchen, hall and living room, and went to her front door. The rooms were closely connected and the living room opened on the front porch by means of a glass panelled door. The door was equipped with a shade, which was drawn about half-way down. She saw a man from his chest down standing in front of the door. He was dressed in a white T shirt and dark trousers. Her husband having worn a white T shirt and dark dungaree trousers when he went to work that afternoon, she assumed he was returning. Asked what took place, she testified as follows:

"* * * So when I opened the door and Alphonso Ingram was

standing in the doorway. I didn't have the screen between the door and all—

"Q. No screen between you?

"A. No, sir.

"Q. All right. Now how close did he come, when you opened the door, towards you?

"A. He was standing right in the doorway, just right out on the front porch.

"Q. Was the light shining there clearly?

"A. Yes, sir; I had three lights on. The place was as light as day.

"Q. And were you facing him?

"A. Yes, sir.

"Q. Now tell the Court and jury what conversation, if any, took place between you and this party you call Alphonso Ingram.

"A. Alphonso Ingram asked me, when I opened the door, if this was where the Beasleys lived; and I said, 'Yes; that it was.' And he said, 'Does Mr. Beasley want to sell his car?' And I told him that I didn't know about that, that he would have to see my husband. And he said, 'Is your husband home at the time?' And I said, 'No,' without thinking. And I added that he would be back there in ten minutes, although I knew that he wouldn't be back for two and a half or maybe three hours.

"Q. All right. Then what happened?

"A. Immediately after I spoke telling him that my husband would not be back for ten minutes, he lunged at my throat and grabbed me with both hands and started choking me.

"Q. Did he knock you over any place?

"A. He knocked me over a chair that was sitting near the door in my living room; and I screamed once good.

"Q. Now how did he have you, and just tell the Court and jury exactly how it was.

"A. He had—he was pressing here (indicating) and he had both thumbs pressing on my windpipe here (indicating).

"Q. Did he get his hands over your mouth?

"A. Yes, sir; after I screamed the first time, why, he got one hand over my mouth, but he still had me with the other hand by the neck.

"Q. After you screamed the first time he got his hand over your mouth, you say?

"A. That's correct.

"Q. Did you scream any more?

"A. Yes, sir; I screamed a muffled scream while he had his hand over my mouth; and then I screamed another time after I had freed my mouth from his hand.

"Q. All right. Then what happened; did you hear anything else?

"A. I heard my neighbor, Mrs. Tinley, that lives right across the little lane from my home, I heard her scream 'Patricia' I'll be there in a minute.' And I saw her bedroom light come on.

"Q. Was he there at the time?

"A. Yes, sir; he was there.

"Q. All right; heard Mrs. Tinley say 'Patricia, I'll be there in a minute'?

"A. That's right.

"Q. All right.

"A. And I saw her bedroom light come on, and—

"Q. And what was Alphonso Ingram doing all this time?

"A. He was choking me.

"Q. All right.

"A. And she—and when she said, 'Patricia, I'll be there in a minute,' he—the door was partly closed; he had pushed it open and it was partly closed at the time—and he opened the door enough for him to run; and he jumped down off of my front porch and ran around the house.

"Q. Was that right after Mrs. Tinley had yelled, 'Patricia, I'll be there in a minute'?

"A. Yes, sir; yes, sir.

"Q. What bruises were on your face or neck, or wherever it was?

"A. There was plenty of dirt on my neck, long smears of black dirt on both sides of it. And then on this side the skin had been pulled up into a large blue and red welt (indicating) starting about the lobe of my ear and coming down to about the center of my neck. And that mark was on my neck the next morning when I came over here to swear out the warrant for Alphonso Ingram; it had turned black.

"Q. What did you do then when, or after Alphonso Ingram jumped out and left you and went off the porch?

A. Well, by that time, or in just a very short while, Mr. and Mrs. Tinley were with me; and she called the Radford Police.

"Q. Mrs. Tinley called the police?

"A. Yes, sir; I wasn't able to call them; I couldn't hardly speak

"Q. All right. And then what took place?

"A. The City Patrolmen came over, Mr. Thompson and Mr. Knowles, and I gave them the description of the man that had attacked me."

Following Mrs. Beasley's report and description of her attacker to the police, two State troopers, the chief of police of Radford and two patrolmen, armed with a search warrant, went to the home of Alphonso Ingram, distant a mile or less from the Beasley home. The officers arrived there about 10:00 o'clock p. m. Ingram came to the door dressed in a white T shirt and dark trousers, and was promptly arrested. He denied his guilt, and then asked, "Has somebody stole something?" He said something about getting a hat to wear and the chief of police seeing a cap hanging on the wall, told him to put it on. This was done, and Ingram was taken to the front porch of Mrs. Beasley's home. The porch light was on, and there were lights shining on the porch from cars parked near the house, so that he could be seen clearly. Mrs. Beasley was called from a neighbor's home across the street. She came to within a foot of Ingram, and positively identified him as the man who made the attack upon her.

Upon his trial the defendant denied that he had ever been to the house of Mrs. Beasley, denied that he had ever seen her, or that he knew where she lived. He sought to establish an alibi. He told the police, at the time of his arrest, that he had been at his home in bed from five or five-thirty p. m. until they arrived. The officers said that he did not have the appearance of a man who had been asleep. At his trial he testified that he returned home about seven forty-five p. m., talked for a while with his wife and some of his kindred who were present, became tired, went to bed, and remained there until the officers arrived.

The Commonwealth's evidence disclosed that about 6:05 p. m. on the evening of the attack, Ingram tried to cash a check at Smith's Store about two blocks from Mrs. Beasley's home. At that time he had on a baseball cap and a dirty white T shirt.

F. G. Stewart, a colored man, who operated a garage about 300 yards from Mrs. Beasley's home, saw Ingram in the driveway of that garage between 6:00 and 7:00 p. m.

Mrs. B. H. Reed, whose home is about 400 feet from the Beasley home, testified that the defendant, whom she had known

for eight years, came to her back door about 8:30 p. m. and knocked. She was in her lighted living room with her daughter and the latter's two children at the time. She went to the back door, turned on the outside light over Ingram's head and opened the door, leaving the outside screen door closed. Ingram was dressed in a white T shirt, blue pants and a cap. Ingram asked her for a jack. She told him she did not have one, and he left. Mrs. William Roop, the daughter of Mrs. Reed, corroborated the testimony of her mother.

The husband of Mrs. Beasley said that on the afternoon of August 14, 1950, as he was waiting on the side of the road, near the home of Mrs. Reed, to get a ride to his work, Alphonso Ingram, whom he had known for two or three years, passed him in a car, looked at him as he passed and looked back towards him after he passed. He further stated that about the last of May, 1950, he "picked up" Alphonso and another boy in his car and took them to a filling station; that Alphonso asked him if he would sell his car; and that he replied he would if he could get a good price for it.

Ingram denied being at Smith's store, Stewart's garage, or Mrs. Reed's home. He said that he did not go to anybody's house and ask for a jack; did not own an automobile; had no need for a jack; did not ride in Beasley's car in May or ask him about his car; and did not see Beasley on the afternoon of August 14th. He stated that his brother, Albert, told him he had talked to Beasley about the latter's car.

Plaintiff in error concedes that the evidence is sufficient to show that he made an attack upon the prosecutrix. He contends, however, that the evidence fails to reveal with what specific intent the attack was made. He argues that the evidence is susceptible of showing an attempt to commit homicide, murder, robbery, larceny, burglary, preparation to commit arson, or to kidnap the prosecutrix or her baby, or simple assault, and that the jury was not justified in drawing any inference that he had the intent to commit rape.

In support of his contention plaintiff in error relies on *Hairston* v. *Commonwealth,* 97 Va. 754, 32 S. E. 797; *Woodson* v. *Commonwealth,* 107 Va. 895, 59 S. E. 1097; *Thacker* v. *Commonwealth,* 134 Va. 767, 114 S. E. 504; *Mullins* v. *Commonwealth,* 174 Va. 477, 5 S. E. (2d) 491; and *Gillispie* v. *Commonwealth,*

180 Va. 300, 23 S. E. (2d) 146.. Each of these may be readily distinguished on the facts from the present case.

In the first two named cases the evidence did not show the use of force or threats, but only solicitation to commit rape. In the *Thacker Case,* no overt act to commit murder was proven. In *Mullins' Case,* the evidence failed to reveal an intention to consummate rape. In the case of *Gillispie,* the evidence was bare of any threats of violence, any indecent language, or anything indicative of an unlawful purpose.

There are several cases from this jurisdiction and others much closer in point on the specific question here involved.

In *Hart* v. *Commonwealth,* 131 Va. 726, 109 S. E. 582 the facts, with a slight exception, are similar to those here. There a conviction was sustained, and this court said:

"The mode of the attack and the manner in which the force was exerted, unaccompanied by any explanation or indication in the facts certified tending to show any other motive, was sufficient to warrant the jury in finding that the accused intended the natural result indicated by his conduct as intended, namely, the rape of the prosecutrix."

In *Blair* v. *Commonwealth,* 166 Va. 715, 185 S. E. 900, Blair, a Negro, was convicted of attempted rape upon a white girl and sentenced to life imprisonment. The evidence disclosed that the girl was walking along a street in Norfolk, fronting on a vacant lot, when she was seized from behind by the accused. He grabbed her by the throat and threw her to the ground at the edge of the sidewalk. A minute later an officer approached and the accused fled after making a doubtful explanation. The accused did not strike her, did not attempt to pull up her dress, nor put his hands upon her limbs or on any part of her body other than her neck. He made no indecent proposals or advances to her. We reversed his conviction on the ground that the constitutional privilege against self-incrimination was denied the accused when he was required to take the stand in response to a request from a juror. A short time thereafter, the case was again tried, and on substantially the same evidence, the accused was found guilty of attempted rape and sentenced to 15 years in the penitentiary. A writ of error was refused on the ground that the judgment of the lower court was plainly right. (Order of Supreme Court of Appeals, January 18, 1937.)

There is a close parallel between the above case and the

present one. In each the accused did or said nothing which directly indicated his desire to rape the prosecutrix. In each instance she was choked, and the jury was allowed to infer from the circumstances that the accused intended to commit rape.

In *Commonwealth* v. *Derby* (1928), 263 Mass. 39, 160 N. E. 315, the defendant walked up to a woman, a stranger to him, on the street, and made some remark about the weather. She replied but began to walk faster in order to get away from him, whereupon he sprang upon her and knocked her down. Her screams attracted other persons to the scene, and the accused "loosened up" on her. She offered him her "pocketbook or anything" to let her go. The only thing he said was, "Oh, I don't want your pocketbook," and released her. There was no evidence that her clothing had been displaced or disarranged. The defendant denied his presence at the scene of the offense and his identification by the prosecutrix.

The court, in upholding his conviction of assault with intent to rape, said that specific intent was proven and used the following language:

"* * * It is plain there was evidence of an assault, and the criminal intent of the defendant was for the jury to determine in view of all the circumstances. * * * We cannot say as matter of law that the evidence was so slight that it was the duty of the court to direct a verdict of not guilty. * * *"

In *Selby* v. *State* (1929), 112 Tex. Cr. 42, 13 S. W. (2d) 838, a white woman was assaulted at night time by a Negro, when she attempted to pass him on the street. He threw his arm around her neck and drew her towards him. She screamed, and the accused took another grip and threw her to the ground where he choked her and beat her on the head. The woman fought vigorously. An automobile passed and its lights being thrown upon the accused's face, he fled. He said nothing during the attack which would throw light on his purpose. His conviction was upheld upon the ground that the jury were warranted in finding that his intent was to ravish the prosecutrix.

This in one of a class of cases which gives us much concern. It may be said to be a border-line case because, in the absence of any declared intent or purpose by the accused, the question of his intent must be determined from the outward manifestation of his actions leading to usual and natural results, under the peculiar facts and circumstances disclosed. This determination

presents a factual question which lies peculiarly within the province of the jury.

When we consider evidence which the jury had the right to accept, it shows that Mrs. Beasley was a young white woman, alone and undefended, at night in her home. Ingram knew that her husband was absent. He made false statements of his movements on the evening in question. He gave false reasons for his visit to the homes of both Mrs. Reed and Mrs. Beasley. No motive is shown for murder, homicide, or assault and battery. There was no provocation, hate, enmity, or desire for revenge shown. There is nothing to suggest a motive prompting him to make the assault solely for the purpose of inflicting injury. There is no evidence that he was destitute and sought to rob or steal to obtain funds. Larceny or burglary could have been committed in safety by stealth, and without personal assault. The prosecutrix, dressed in her night clothes, presented no opportunity for robbery from the person. There is nothing to indicate an attempt to commit arson. Physical attack does not fit in with such a design. No reason, purpose or preparation to kidnap can be discerned.

Ingram admitted that he had no need for a jack. It may, therefore, be reasonably inferred that his inquiry for one was but a pretext to gain entry to a house occupied by a lone woman. He found a lone woman and subjected her to brutal attack without a single indication that his intent was to maim, kill, rob or kidnap. When he put his hands violently upon her neck, her stifled outcries brought a response which prevented further injuries to her, and frustrated his designs. It is true that he did not undertake to raise prosecutrix's clothing, but he had no opportunity to do so under the fast happening circumstances. It is also reasonable to infer that his effort to strangle the woman was to prevent any outcry which she could have made upon receiving an insulting proposal.

■■ We have frequently said that ''An attempt to commit a crime is composed of two elements: (1) The intent to commit it; and (2) a direct, ineffectual act done towards its commission. The act must reach far enough towards the accomplishment of the desired result to amount to the commencement of the consummation.'' *Thacker* v. *Commonwealth, supra; Dixon* v. *Commonwealth,* 162 Va. 798, 803, 173 S. E. 521; *Mullins* v. *Commonwealth, supra.*

It is clear that the assault upon the prosecutrix was an overt act which amounted to the commencement of the consummation of a crime of violence. It is equally clear that it was committed in pursuance of some evil intent or purpose. The mode of the attack, the manner in which it was exerted, the occasion and circumstances, the testimony of Ingram, unaccompanied by any explanation or indication in the evidence, tend to show no motive other than to gratify his lust by the rape of the prosecutrix. The character of the attack apparently afforded a prospect of success and tended to make the commission of the crime of rape effectual.

For what purpose would a man attack a defenseless woman, at night, dressed in her night clothes? Inferences and deductions from human conduct may be properly drawn when they follow naturally from facts proven. In this case, the conduct of the accused, under the conditions and circumstances described, points with reasonable, if not with unerring certainty, to his specific intent to commit rape. It is inconsistent with his innocence, or with any interpretation save that of such an intent.

The jurors were fully and carefully instructed upon all phases of the case. They had the opportunity of seeing, hearing and observing the witnesses in person and evaluating their evidence. Upon review, we cannot set aside the judgment of the trial court approving their verdict, "unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it." Code of Virginia, 1950, section 8-491.

Under the facts, we do not feel justified in holding that the evidence was insufficient to warrant a jury in finding that plaintiff in error was guilty of attempted rape. Accordingly, we are of opinion to affirm the judgment of the trial court.

*Affirmed.*