# Staunton

JOHNNY PAUL TAYLOR v. COMMONWEALTH OF VIRGINIA.

September 9, 1966.

Record No. 6295.

Present, All the Justices.

*John A. Gurkin, Jr.* for the plaintiff in error.

*William P. Bagwell, Jr., Assistant Attorney General (Robert Y. Button, Attorney General,* on brief), for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

The defendant, Johnny Paul Taylor, was tried on two indictments, each containing three counts. Indictment numbered One, in

its first count, charged that the defendant "on the 6th day of January, 1965, in and upon one, Carmelita Jackson, a female child under the age of sixteen years, to-wit: of the age of seventeen months, feloniously did make an assault and her the said Carmelita Jackson then and there feloniously did attempt to ravish and carnally know * * *." §§ 18.1-16 and 18.1-44, Code of Virginia, 1950, Repl. Vol. 1960. A second count charged that the said defendant, on the same day, "with lascivious intent, did unlawfully and feloniously, knowingly and intentionally place and attempt to place his hand and a portion of his hand upon and against the sexual and genital part" of the above mentioned female child, § 18.1-215 (1), Code of Virginia, 1950, Repl. Vol. 1960, and the third count charged that the defendant, on the day above mentioned "with lascivious intent, did unlawfully and feloniously, knowingly and intentionally, fondle and feel, and attempt to fondle and feel, the sexual and genital part of the said female child." § 18.1-215 (2) Code of Virginia, 1950, Repl. Vol. 1960.

Indictment numbered Two, in its first count, charged that the defendant, on the 6th day of January, 1965, "in the nighttime of said day, feloniously and burglariously did break and enter the dwelling house of one, Delores Marie Jackson, with intent then and there in said dwelling house" to commit larceny. The second count charged the defendant did on the same day and night, break and enter the dwelling house of Delores Marie Jackson "with intent then and there * * * to commit rape." The third count charged that, on the same occasion, the defendant did break and enter the dwelling house of Delores Marie Jackson, "with intent then and there in said dwelling house, feloniously and burglariously to commit a felony." § 18.1-86 Code of Virginia, 1950, Repl. Vol. 1960.

On February 1, 1965, the court appointed John A. Gurkin, Jr., a discreet and competent attorney at law, to represent the defendant, an indigent person. Trial on the two indictments was set to be had on March 17, 1965. On that day, after being advised by his counsel, and by the court as to his rights, the defendant, in his own proper person and by counsel, asked to be tried on both indictments at the same time by the court without a jury. Upon being arraigned upon each indictment, he pleaded not guilty to each, and with the concurrence of the Attorney for the Commonwealth, and of the court, entered of record, the whole matter of law and

fact as to each indictment was heard and determined by the court, without the intervention of a jury.

At the conclusion of the Commonwealth's evidence, defendant moved to strike it as to each of the charges contained in the two indictments. The Attorney for the Commonwealth replied that it was not his contention that defendant "had an intent to commit larceny, but that he attempted to commit the felony of rape, and that he did." The court sustained the motion as to all counts of Indictment Number One, and to the first and second counts of Indictment Number Two, alleging, respectively, burglary with intent to commit larceny and burglary with intent to commit rape. It overruled a motion as to the third count of Indictment Number Two, alleging burglary "with intent * * * to commit a felony." Defendant noted an exception.

The evidence on behalf of defendant, including his own testimony, was then presented, and upon the conclusion thereof, defendant moved the court to strike the evidence of the Commonwealth as to the third count of Indictment Number Two. The court overruled the motion, and defendant duly excepted. Thereupon, on March 17, 1965, the court entered its judgment order reciting that: "It is considered by the Court that the said defendant is not guilty as charged in Indictment numbered One, and that he is not guilty as charged in either the first or second counts of Indictment numbered Two, and that he be acquitted and discharged as to these said charges, but it is considered by the Court that the defendant is guilty of Burglary as charged in the third count of Indictment numbered Two, * * *."

The case was referred to a probation officer for a pre-sentence report. On August 6, 1965, the pre-sentence report was read in full in open court, in the presence of defendant, and on the same day, defendant was sentenced to serve five years in the Virginia State Penitentiary. Defendant applied for and obtained this writ of error.

On appeal, defendant contends that the court erred in failing to sustain his motion to strike the evidence as to the third count in Indictment Number Two, and in not setting aside the judgment as contrary to the law and the evidence, in view of his acquittal of all charges in Indictment numbered One, and of the charge of intent to commit rape, alleged in count two of Indictment numbered Two. He contends that there was "no evidence that he was guilty

of burglary with the intent to commit a felony of any kind;" and submits that if he was guilty of any offense whatever, it was trespass, a misdemeanor, and not a felony.

The Attorney General, in his brief, concedes that: "The evidence does not show an assault on Mrs. Jackson." He says: "The position of the Commonwealth is that the defendant went to Mrs. Jackson's house for the purpose of gratifying his sexual desire, and his actions clearly indicated his intent to accomplish that end feloniously after it became apparent that he would not be able to achieve that result otherwise." He, however, further argues that "The entry of the defendant, under the circumstances, indicated an intent to overcome her (Mrs. Jackson's) resistance by maliciously wounding or disabling her, if necessary to accomplish his purpose, if she were still in the apartment, and if not to gratify his lust upon the infant girl lying on the bed, whom he had seen through the window." He concedes that: "Neither of these felonies was specifically charged in any count of either indictment."

The evidence, considered in the light most favorable to the Commonwealth, may be summarized as follows:

Mrs. Delores Marie Jackson, on the evening of January 6, 1965, occupied a first floor apartment in a two-story building in Norfolk, Virginia, with her two infant children, a girl about seventeen months of age and a boy about six months old. Her husband, a member of the United States Navy, was at sea. The building has four apartments, two on each floor. To enter Mrs. Jackson's apartment from the street, one comes through a door on a front porch into a hallway, used by all tenants of the building. The door of the Jackson apartment is on the left side of the hall leading into a living room-bedroom accommodation. Behind the living room is a kitchen, and next to it is a bathroom shared by both apartments on the first floor. The back door of the first floor of the building opens out of the apartment next to that of Mrs. Jackson. That apartment was vacant on January 6, 1965. To reach the back door, Mrs. Jackson has to go through the bathroom and into the vacant apartment.

Mrs. Jackson testified that about 11:00 p. m., on January 6, 1965, the defendant knocked on the door of her apartment; that she asked who was there; and defendant replied that he had come to see her about her television set. She told him that it was too late for him to come in. He declared that if she did not open the door, he would break it down. He then moved to a window of her

apartment, on the porch in front of her apartment, and began "pounding" on it. She went into the kitchen, got a butcher knife, and threatened to cut him if he came in. He returned to her door and started "pounding and pulling" on it. This frightened her, and she left by her back door, and went across the street to the home of a neighbor, in search of help. She said she left her two children in their respective beds, the girl fully clothed, wearing diapers, which were pinned, rubber pants and pajamas.

Mrs. Jackson said when she left the apartment, her front door and the window through which the defendant looked were locked; and that she closed the door from the bathroom into the vacant apartment, and also the back door; but did not lock them. She returned, within a few minutes, with Edward Robinson and his wife. Her children were crying, and she heard the defendant tell them to "Shut up." The Robinsons said they heard a man's voice in the apartment, but could not understand what he said. Mrs. Jackson went to a telephone to call the police. Robinson walked around the back of the apartment, and as he neared its back door, he saw the defendant coming out of the house through that door. Robinson grabbed and held him until the police arrived. He said that Taylor appeared to him to be intoxicated, and muttered something about trying to sell Mrs. Jackson a television set.

When Mrs. Jackson, with the police, reentered her apartment, they found her female child wearing only the top of her pajamas and bleeding from her sexual organs. The child was taken to a hospital, examined by a doctor, who said there was a small scratch or abrasion on the inside of her vaginal canal; there was no indication as to what caused it; and that the infant could have "possibly scratched" herself. There was no bleeding of the vagina, when he saw the child, although there "was evidence of recent bleeding in her vaginal canal." He prescribed no treatment, because "It was something that would stop of its own accord."

The baby girl's diapers were found under a blanket on the bed; but the pins with which they were fastened were not found. The record does not show what became of the rubber pants.

Mrs. Jackson said that she had seen the defendant on three previous occasions. He had come to her house two or three weeks before January, 1965, to repair her T-V set, and had asked her, at that time, whether she wanted to buy a new set. On New Year's Eve, 1965, he brought a set to her house, and on New Year's Day,

he returned and took the T-V set away. She said the first visit was made about noon, the second between 6:00 and 7:00 o'clock in the evening, and the third in the afternoon.

On cross-examination, Mrs. Jackson said that the defendant did not stay at her house on the day he delivered the T-V set; that he never stayed there any length of time; and "never made any passes at" her. Said she: "He didn't hang around me. I told him to 'Get out of my house.' "

The defendant is married, and is the father of an eighteen months old son. He testified that he went to Mrs. Jackson's home on December 27, 1964, in response to a "sales date request." He fixed the visit at 12:30 a.m., and said that she agreed to buy a T-V set from him and signed a contract which did not bear her husband's name.

Taylor said that he again went to Mrs. Jackson's home on New Year's Eve about 12:45-1:00 a.m.; she met him at the door, clothed in a housecoat, open down the front, revealing that she had on no underclothing; he went into her apartment; and after telling her how to operate a T-V set he delivered, he saw her sitting on the bed; he went over to the bed and had "sexual relations" with her; and left the apartment about 4:30 in the morning. He said that his purpose in going to her apartment on that occasion was to sell her a T-V and "probably to go to bed with her." On cross-examination, he said that he did not give Mrs. Jackson anything for going to bed with him, and that "I guess maybe there was a little propositioning by both of us."

Defendant next returned to the apartment at 2:30 in the afternoon of New Year's Day, asked her when her husband was coming home, and was told that her husband would return about March 1st; he told her he would have to take the T-V set back because her husband had not signed the contract; and he did, at that time, repossess the set.

Defendant gave several different versions of his January 6th visit. He said he went to the apartment for the purpose of getting her husband to sign a contract for the sale of a T-V set; she came to the door of the building, "pushed the curtain back, and her apartment door was wide open;" she greeted him by saying: "You old dog, how have you been?"; he took her actions and words to be an invitation to come in, so he walked in; "she was not there. She was gone;" the back door of the apartment was open; and she had walked on out of that door about ten feet ahead of him. Said he:

"The police happened to be there, and they apprehended me, they picked me up." He also said that the front door of the building was closed but not locked; that when he knocked on that door, no one answered, so he looked in the window and saw Mrs. Jackson with her two children in the living room; and when he entered Mrs. Jackson had left the building, and disappeared from his sight; and that her two children were in one bed, and each began to cry. He then noticed that the little girl was wearing only the top of her pajamas. He denied that he touched her. He walked through the apartment, through the back door, looking for Mrs. Jackson, and as he emerged from the house, he was grabbed by Robinson, the neighbor of Mrs. Jackson. He admitted that he had had a "few drinks" before coming to the house, and denied that he intended doing Mrs. Jackson any harm.

James Ross testified that he drove the defendant on New Year's Eve to some lady's apartment; that they found a light on; that defendant went in while he, Ross, stayed in the car; that defendant later returned to the car, and Ross drove him to a shop where defendant picked up a T-V set; and that he then carried the defendant and the T-V set to the lady's apartment, and left.

There was no evidence that the door of Mrs. Jackson's apartment was damaged in any way, or that defendant attempted to assault her, or uttered any threats against her.

It will be noted that count three of Indictment Number Two charges generally that the defendant broke and entered the dwelling house "with intent then and there in said dwelling house, feloniously and burglariously to commit a felony." The word "felony" is a generic term employed to distinguish certain high crimes from minor offenses known as misdemeanors. The averment wholly fails to specify the offense or felony which it alleges he intended to commit. Specific intent is an essential element of burglary. §§ 18.1-86, 18.1-88 and 18.1-89, Code of Virginia, 1950, Repl. Vol. 1960. It is elementary that a defendant is entitled to be apprised of the offense which he is required to answer. *State* v. *Allen*, 186 N. C. 302, 119 S. E. 504, 505; 13 Am. Jur., 2d Burglary, § 36, page 341; 3 Mich. Jur., Burglary and Housebreaking, § 12, page 643; 9 Mich. Jur., Indictments, Informations and Presentments, § 23, pages 667-670.

Although defendant made no objection to the averment of the count under which he was convicted, it is manifest from the ad-

missions, concessions and contentions of the Commonwealth that his prosecution was based on the theory that he broke and entered the house of Mrs. Jackson, with intent to commit a sexual offense against her or her infant daughter.

The Commonwealth agreed that there was no evidence that defendant broke and entered the house with intent to commit larceny. It conceded that no assault was made on Mrs. Jackson. There is no evidence in the record that Taylor made any threats against Mrs. Jackson or any other person; nor any evidence that he intended to wound or disable Mrs. Jackson, if it were necessary to accomplish whatever purpose he may have had in mind. As a matter of fact, he was not present with her in her apartment, even for a matter of seconds, on the occasion involved.

The court found him not guilty of an attempt to ravish the female infant, not guilty of the intent, or an attempt, to take indecent liberties with that infant, nor guilty of the intent to commit larceny, and not guilty of the intent to commit rape, the only offenses of which any proof was offered. There was no evidence of an intent to commit any other felony. Having been acquitted of the several felonies charged, the Commonwealth was barred from a further prosecution of such felonies. *Mitchell* v. *Commonwealth*, 141 Va. 541, 552, 127 S. E. 368.

If we accept the testimony of defendant that he had had "sexual relations" with Mrs. Jackson on New Year's Eve, and that his purpose in going to her apartment on January 6th, was both to sell her a T-V and "probably to go to bed with her," that does not show that he intended to accomplish his purpose notwithstanding resistance by Mrs. Jackson. We cannot deduce just what the defendant intended when he entered the Jackson apartment other than from his statements, and his acts. It is possible that it may have been for a felonious purpose; but possibility is not sufficient proof for criminal conviction. The burden was on the Commonwealth to establish all facts necessary for conviction beyond a reasonable doubt. It is just as reasonable to conclude that Taylor intended to persuade Mrs. Jackson to have "sexual relations" with him as it is to conclude that he intended to do so by force, if necessary. If his persuasive efforts were successful, the act would not amount to a felony and his conviction would be unwarranted.

The evidence is sufficient to show that defendant broke and entered the dwelling house in the nighttime; but "It is the law in this

jurisdiction that where a statute makes an offense consist of an act combined with a particular *intent*, such *intent* is as necessary to be proved as the act itself, and it is necessary for the intent to be established as a matter of fact before a conviction can be had. Surmise and speculation as to the existence of the intent are not sufficient, and 'no intent in law or mere legal presumption, differing from the intent in fact, can be allowed to supply the place of the latter.' " *Thacker* v. *Commonwealth*, 134 Va. 767, 770, 114 S. E. 504, 505. *Dixon* v. *Commonwealth*, 197 Va. 380, 382, 89 S. E. 2d 344.

While the conduct of the defendant was reprehensible, the court had before it no facts upon which it could base its judgment. The conclusion that he was guilty of having entered the building "with intent then and there * * * to commit a felony," was based upon mere surmise and speculation.

The case of *Ingram* v. *Commonwealth*, 192 Va. 794, 66 S. E. 2d 846, relied upon by the Commonwealth, may be distinguished upon the facts. There, defendant, at night, attacked a woman dressed in her nightclothes, grabbed her by the throat, and choked her. The character of the attack afforded a prospect of success, which tended to make the commission of the crime of rape effectual. Those facts are absent here. Cf. *Mitchell* v. *Commonwealth, supra*; *Williams* v. *Commonwealth*, 193 Va. 764, 771, 71 S. E. 2d 73.

The trial judge, in an oral opinion rendered when he struck the evidence as to all counts in Indictment Number One and as to counts one and two in Indictment Number Two and overruled the motion to strike as to the third count of Indictment Number Two, said: "There is also evidence that the child received an injury to her female parts, which she did not have prior to the time the defendant entered the apartment * * *. The injury was bleeding * * *." It thus appears that the conviction of the defendant was based upon the finding that he inflicted the injury to the child. Such a finding overlooks his acquittal of that charge. The physical condition of the child, unexplained as to cause, should not have been considered as due to the act or acts of the defendant indicating his felonious intent when he broke and entered the building.

For the reasons stated, the judgment finding the defendant guilty under count three of Indictment Number Two is reversed and set aside; and the case remanded for such further proceedings as the Commonwealth may be advised.

*Reversed and remanded.*