COURT OF APPEALS OF VIRGINIA

Present:   Judges Elder, Beales and Senior Judge Willis
Argued at Salem, Virginia

SCOTT EDWARD KNIGHT

v.      Record No. 0768-11-3

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE RANDOLPH A. BEALES
NOVEMBER 13, 2012

FROM THE CIRCUIT COURT OF THE CITY OF STAUNTON
Humes J. Franklin, Jr., Judge

Linda L. Czyzyk, Assistant Public Defender (Office of the Public
Defender, on brief), for appellant.

Rosemary V. Bourne, Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


Scott Edward Knight (appellant) was convicted at a bench trial in the Circuit Court of the

City of Staunton of four counts of malicious wounding in violation of Code § 18.2-51, and three

counts of felony destruction of property in violation of Code § 18.2-137.[1]  On appeal, appellant

asserts (1) that the evidence at trial was insufficient to prove beyond a reasonable doubt that he

acted with malice or with intent to maim, disable, or kill – and (2) that he did not have the

specific intent to damage property when he drove his vehicle more than 40 to 70 miles per hour

in excess of the speed limit in a populated area, causing a multiple car crash that injured several

people and "totaled" multiple vehicles.  For the following reasons, we disagree and we affirm his

convictions.

---

[1] Appellant was also convicted of reckless driving, but that conviction is not the subject
of this appeal.

## I. BACKGROUND

On April 6, 2010, at approximately 3:50 p.m., appellant was involved in a multiple car crash on West Beverley Street in the City of Staunton. Appellant was driving Tiffany Colvin's white Volkswagen Jetta, which was in good working condition with properly functioning brakes. Ms. Colvin, appellant's girlfriend, had asked appellant to drive her uncle, Stanley Colvin, to the Department of Motor Vehicles. On that clear and dry afternoon, the Jetta that appellant was driving reached speeds of 77 to 107 miles per hour – 42 to 72 miles per hour *over* the posted speed limit of 35 miles per hour while driving east on West Beverley Street (where there is a "slight down grade" for vehicles traveling in that direction). He moved out of the through lane of traffic and into the left turn lane, and drove the Jetta into a Jeep Grand Cherokee in the left turn lane, causing the two vehicles to hit a Ford Taurus. The collision occurred in a populated area inside the City of Staunton where there was a Food Lion, Wade's Store, Two by Two Learning Center, and other places of business.

Eight eyewitnesses testified that appellant was driving at dangerously excessive speeds immediately prior to the crash. Approximately five minutes before the crash, two Augusta County Sheriff's deputies, who were on their way to another call, observed a white Jetta traveling eastbound on Parkersburg Pike toward Staunton. One of the officers, Officer Pultz, testified that the car was "flying" past him, and he estimated that it was traveling "well over" 80 miles per hour. The other officer, Officer Smith, testified that he estimated the Jetta was traveling 80 miles per hour or above. The posted speed limit at the location where Officer Smith observed appellant's speed was 45 miles per hour.

Chuck Berry, a water truck driver, was travelling in the vicinity of Parkersburg Pike just west of Staunton, when he witnessed a white Jetta traveling at a high rate of speed. While he could not give an exact estimate of how fast appellant was traveling, he testified that the white

Jetta was traveling "at a high rate of speed toward [him]" and that the white Jetta "was going pretty good." Thomas Newman, a general contractor, testified that he saw a white Volkswagen Jetta pass a red Corvette at a "high rate of speed" – so fast that it made the Corvette look as though it was "almost sittin[g] still." Tammy Balser, the assistant customer service manager at Food Lion on West Beverley Street, testified that she observed a white car going "really fast" and "a lot quicker than what you would see on a normal day." She further noted that "there is a lot of traffic on that road."

Elizabeth Tinsley was getting ready to turn into the Two by Two Learning Center when she observed a vehicle go past her "really fast," forcing her to pull over to the side of the road to avoid being hit by appellant. When asked if appellant appeared to be braking, she testified that "[i]t didn't appear that [appellant was] stopping." Joy Riley Surratt, a preschool teacher at Two by Two Learning Center, was at the Center's playground at the time of the crash. As part of her job, she is regularly out on the playground located between the Two by Two Learning Center and the Food Lion. Surratt, who hears traffic on West Beverley Street all the time, testified that on the day of the crash, she saw a white car traveling "at a very high rate of speed" toward the Food Lion. She noted that "traffic is normally not going very fast" in that area because the speed limit drops from 35 miles per hour to 25 miles per hour just after the crash site.

Another witness, Rhoda Derstine, testified that at approximately 3:45 p.m., while she was driving home after working at her job as a school librarian, she was almost hit by a lighter colored vehicle traveling at a "startlingly fast" rate. She was traveling on Parkersburg Pike when she saw a vehicle "down a ways, far enough that [she] felt like [she] had plenty of time to turn . . . to the right lane," but she "did not have [her] turn completely made and there was a vehicle immediately . . . outside [her] rearview mirror." Derstine pulled over to the side of the road because she was "shaking" and felt that she "would have been killed if [she] hadn't moved." She

testified that she noticed the passenger in the vehicle was "sitting upright and stiff, just staring straight ahead" and that "[t]he driver . . . looked like he was laughing."

The Commonwealth's expert, Master Trooper Joel W. Sullivan, Jr., testified that, based on his reconstruction of the scene of the crash, the Jetta continued driving in a straight direction through the turn lane, until the point of impact. Master Trooper Sullivan estimated that the Jetta must have been traveling between 103 and 107 miles per hour immediately prior to beginning its pre-impact skid and that the Jetta was traveling between 77 and 83 miles per hour at the moment of impact with the Jeep Grand Cherokee. The posted speed limit at the site of the collision was 35 miles per hour.

The first car that appellant hit was a Jeep Grand Cherokee that was owned and driven by Elizabeth Benbow. She was driving, at most, 10 miles per hour eastbound in the left turn lane of West Beverley Street, and preparing to turn left into the Food Lion parking lot when she was struck by appellant. She testified that, as a result of the crash, she suffered injuries to her brain, clavicle, and scapula, as well as a broken rib. Her Jeep Grand Cherokee, which she estimated to be worth $6,000 before the crash, was declared "totaled" by the insurance company. Her 14-year-old son, who was a passenger in the vehicle at the time of the collision, testified that he suffered cuts, bleeding, bruises, headaches, and neck pain from the crash.

As a result of appellant's driving the Jetta into the Jeep Grand Cherokee, the two vehicles both hit another vehicle – a Ford Taurus owned and driven by Nannie Brown. She was in the westbound lane of traffic when she was hit. Brown tried to apply her brakes to avoid being hit by appellant, but she was unsuccessful. Brown suffered a deep abrasion on her leg and fractured her sternum. She estimated her car to be worth $1,600 before the crash, but it was declared "totaled" by the insurance company after the crash.

The passenger in the Jetta driven by appellant, Stanley Colvin, did not testify at trial due to his severe physical injuries.[2] Stanley Colvin's brother, Donald Colvin, testified without objection to his brother's injuries. Donald Colvin stated that, before the crash, Stanley Colvin had been in good health, but that, after the crash, he was hospitalized and almost died as a result of the injuries sustained in the crash. Donald Colvin testified that, as a result of the crash, his brother was in intensive care for three months and that his leg bone had been pushed up through his hip socket and had broken his pelvis. Corporal Campbell, who was one of the first to respond to the collision, testified that Stanley Colvin was "bloody and obviously screaming in pain." Tiffany Colvin, the owner of the Jetta driven by appellant, estimated that the value of the car was $2,300 before the crash.

## II. ANALYSIS

When considering the sufficiency of the evidence on appeal, "a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Crowder v. Commonwealth, 41 Va. App. 658, 663, 588 S.E.2d 384, 387 (2003) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). "Viewing the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court," Riner v. Commonwealth, 268 Va. 296, 330, 601 S.E.2d 555, 574 (2004), "[w]e must instead ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" Crowder, 41 Va. App. at 663, 588 S.E.2d at 387 (quoting Kelly v. Commonwealth, 41 Va. App. 25, 257, 584 S.E.2d 444, 447 (2003) (*en banc*)). See also

---

[2] On brief, appellant argues, "because Stanley Colvin did not appear in court to testify to his injuries, Mr. Scott [sic] believes the trial court erred in finding him guilty beyond a reasonable doubt of maliciously wounding Mr. Colvin." However, appellant's assertion is not properly reflected in his assignments of error. See Rule 5A:12(c). Further, appellant did not comply with Rule 5A:20 because he did not cite any authority to support this argument. As such, this argument was not properly presented on appeal, and this Court will not consider it.

Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008).  "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  Jackson, 443 U.S. at 319.

Moreover, Code § 8.01-680 states that:

> When a case, civil or criminal, is tried by a jury and a party objects to the judgment or action of the court in granting or refusing to grant a new trial on a motion to set aside the verdict of a jury on the ground that it is contrary to the evidence, or when a case is decided by a court without the intervention of a jury and a party objects to the decision on the ground that it is contrary to the evidence, *the judgment of the trial court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it.*

(Emphasis added).  Using this appropriate standard of appellate review, we cannot say that the trial court was plainly wrong as a matter of law in convicting appellant of malicious wounding in violation of Code § 18.2-51, and felony destruction of property in violation of Code § 18.2-137.

### A.  Malicious Wounding Convictions

Appellant argues that there is insufficient evidence supporting his conviction of four counts of malicious wounding in violation of Code § 18.2-51, which states as follows:

> If any person maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall, except where it is otherwise provided, be guilty of a Class 3 felony.  If such act be done unlawfully but not maliciously, with the intent aforesaid, the offender shall be guilty of a Class 6 felony.

Specifically, appellant argues that he did not act maliciously and that he did not have the specific intent to maim, disfigure, disable, or kill.

Malice

"Whether or not an accused acted with malice is generally a question of fact and may be proved by circumstantial evidence." Canipe v. Commonwealth, 25 Va. App. 629, 642, 491 S.E.2d 747, 753 (1997).

> Malice inheres in the intentional doing of a wrongful act without legal justification or excuse. Malice is not confined to ill will, but includes any action flowing from a wicked or corrupt motive, done with an evil mind or wrongful intention, where the act has been attended with such circumstances as to carry in it the plain indication of a heart deliberately bent on mischief.

Williams v. Commonwealth, 13 Va. App. 393, 398, 412 S.E.2d 202, 205 (1991).

"In making the determination whether malice exists, the fact-finder must be guided by the quality of the defendant's conduct, *its likelihood of causing death or great bodily harm, and whether it was volitional or inadvertent . . . .*" Essex v. Commonwealth, 228 Va. 273, 282, 322 S.E.2d 216, 221 (1984) (emphasis added). Furthermore, "[m]alice may be inferred 'from the deliberate use of a deadly weapon.'" Doss v. Commonwealth, 23 Va. App. 679, 686, 479 S.E.2d 92, 96 (1996) (quoting Perricllia v. Commonwealth, 229 Va. 85, 91, 326 S.E.2d 679, 683 (1985)). "A motor vehicle, wrongfully used, can be a weapon as deadly as a gun or a knife." Essex, 228 Va. at 281, 322 S.E.2d at 220.

There are two types of malice – express malice and implied malice. "Implied malice may be inferred from 'conduct likely to cause death or great bodily harm, wilfully or purposefully undertaken.'" Canipe, 25 Va. App. at 642, 491 S.E.2d at 753 (quoting Essex, 228 Va. at 281, 322 S.E.2d at 220). "Generally, implied malice is equivalent to 'constructive malice;' that is, 'malice as such does not exist but the law regards the circumstances of the act as so harmful that the law punishes the act as though malice did in fact exist.'" Pugh v. Commonwealth, 223 Va. 663, 668, 292 S.E.2d 339, 341 (1982) (quoting 1 Wharton's Criminal Law and Procedure § 245, at 529 (1957)). Here, the totality of appellant's volitional acts were such that a rational fact

finder could have found that he intended to cause death or great bodily harm and, thus, that his malice was implied.

Appellant cites Essex as a case whose facts are directly on point. The Supreme Court in Essex reversed Essex's conviction for second-degree murder because the Court found the Commonwealth's evidence was insufficient as a matter of law to support a finding of implied malice. 228 Va. at 284, 287, 322 S.E.2d at 222, 224. However, in deciding Essex, the Supreme Court expressly focused its analysis and holding on the specific and unique issue of how *driving under the influence* affects the element of malice necessary to support a conviction of second-degree murder.[3] Here, there is no issue of whether appellant was driving under the influence, so the analysis in Essex is just not squarely on point with the circumstances here.

Even if Essex could be interpreted more broadly than in the specific context of a motorist who drives under the influence, the facts of this case are still quite different and easily distinguishable from those in Essex. Furthermore, the facts here meet the general description of a motorist who acts with malice, as described by the Supreme Court in Essex.

Here, unlike in Essex, there is sufficient evidence from which a rational fact finder could infer that appellant's actions constitute implied malice because they were volitional and intentional, and it was inevitable that, under the circumstances of this case, they would result in death or great bodily harm. In Essex, the defendant was driving at night. Here, the evidence

_____

[3] The Supreme Court in Essex specifically outlined the issue it addressed:

> In this case of first impression, we must determine whether driving under the influence of alcohol resulting in a fatal collision, can supply the requisite element of implied malice to support a conviction of second-degree murder. The appeal also raises questions concerning the application of the statutory presumption of intoxication in a prosecution for both homicide and driving under the influence.

228 Va. at 278, 322 S.E.2d at 218.

- 8 -

shows that appellant was travelling during the afternoon at approximately 3:50 p.m., on a clear and dry day, and in an area populated with numerous other motorists and near a shopping plaza in a commercial area of the City of Staunton where there was a Food Lion, Wade's Store, Two by Two Learning Center, and other places of business. According to eight eyewitnesses, appellant drove through this populated area at an extremely high rate of speed. Master Trooper Sullivan estimated that appellant was driving at a speed of roughly 103 to 107 miles per hour before the crash – in an area with a posted speed limit of 35 miles per hour, with a sign notifying drivers to reduce their speed ahead. Appellant was driving the Jetta so fast in a populated area with numerous cars around that a rational fact finder could infer that he intended to use the Jetta as a deadly weapon. Essex, by comparison, was only driving 55 miles per hour, and the record in Essex does not indicate that the defendant was driving through a commercial area. Rather than driving inside the *City* of Staunton, as was appellant, Essex was driving 55 miles per hour on State Route 28, out in the County of Fauquier.

While Essex was driving under the influence of alcohol, there is no evidence here that appellant's vision or abilities were in any way impaired prior to the crash. Appellant drove the Jetta out of the through lane of traffic and into the left turning lane where customers drive to enter the Food Lion Shopping Plaza. He applied the brakes, but investigators approximated that, even though the posted speed limit was 35 miles per hour, appellant was still traveling 77 to 83 miles per hour when he actually hit the Jeep Grand Cherokee, which was preparing to turn left into the shopping plaza and was traveling approximately 10 miles per hour when struck by appellant. Moreover, while Essex swerved while driving, there is no indication from the record that appellant here was trying to avoid contact, especially when the evidence is viewed in the light most favorable to the Commonwealth (as we must since it was the prevailing party below). A fact finder could rationally conclude that, because appellant only applied his brakes at the very

last moment, the braking was merely intended as a sheer act of self-preservation.  Elizabeth

Tinsley, an eyewitness, testified that it did not appear that appellant was stopping.  Moreover,

appellant's application of the brakes only marginally decreased his dangerously excessive speed

– from 103 to 107 miles per hour to 77 to 83 miles per hour, in an area where the speed limit was

35 miles per hour and where a sign noting "Reduced Speed Ahead" was posted.  Appellant drove

so fast just before the crash that three witnesses testified that they actually moved to avoid being

hit by appellant (and only two of those witnesses were successful).  In Essex, the defendant was

the one swerving – albeit between lanes of traffic.

In addition to the fact that this case is distinguishable from Essex because appellant here

drove extremely fast in a populated area, the facts in this case appear to meet the Supreme

Court's described requirements in Essex of a motorist who acts with malice when driving his

vehicle into a crowd of people for the perverse thrill of terrifying people.  The Supreme Court

explained:

> [A] motorist who attempts to pass another on a "blind curve" may
> be acting with such criminal negligence that if he causes the death
> of another in a resulting traffic accident he will be guilty of
> manslaughter.  And such a motorist may be creating fully as great
> a human hazard as one who shoots into a house or train "just for
> kicks," who is guilty of murder if loss of life results.  The
> difference is that in the act of the shooter there is an element of
> *viciousness* – an extreme indifference to the value of human life –
> that is not found in the act of the motorist.

Essex, 228 Va. at 284, 322 S.E.2d at 222 (quoting Blackwell v. State, 369 A.2d 153, 158 (Md.

Ct. Spec. App. 1977)).  The Supreme Court in Essex further stated that "one who deliberately

drives a car into a crowd of people at a high speed, not intending to kill or injure any particular

person, but rather seeking the perverse thrill of terrifying them and causing them to scatter might

be convicted of second degree murder if death results."  Id. at 283, 322 S.E.2d at 220.

Second-degree murder, of course, is a homicide committed with malice.  Id. at 280, 322 S.E.2d

at 219-20.  Similarly, as discussed *supra*, malicious wounding is a crime requiring the presence of malice.  Thus, this portion of the Supreme Court's opinion in Essex is applicable here – to the extent that it discusses circumstances supporting a finding of malice.

In this case, when appellant drove at an extremely high rate of speed, he chose to drive the Jetta *out* of the eastbound through lane of traffic and *into the left turn lane where vehicles wait to turn into the Food Lion Shopping Plaza* (as opposed to choosing to continue driving in the only through lane or choosing to veer away from traffic, even off of the road).  A rational fact finder could infer that, when driving at such a high rate of speed in the left turn lane, where drivers exit the road to enter the plaza where the Food Lion is located, appellant intended to ram into other vehicles waiting to turn into the shopping plaza.

Moreover, Rhoda Derstine testified that she saw appellant laughing while driving at these incredibly high speeds.  Derstine also testified that while appellant "was laughing," the passenger in the vehicle sitting beside him, on the contrary, was "sitting upright and stiff, just staring straight ahead."

Given all the circumstances in this case, a rational fact finder could certainly infer that, when appellant was observed laughing while he was driving for quite some time at approximately 42 to 72 miles per hour *above* the speed limit (causing at least three people to move to avoid being hit by appellant), in a populated area with numerous cars around, he acted willfully, volitionally, and with implied malice.  A rational fact finder could make this conclusion especially in light of the fact that appellant moved into the left turn lane and rammed into the back of the car there that was waiting to turn into the Food Lion Shopping Plaza.

Appellant's actions were more than simply reckless, grossly negligent behavior.  A rational fact finder could conclude that, when appellant chose to drive the Jetta in this extremely dangerous manner at these incredibly high speeds, he was, as the Commonwealth's attorney

- 11 -

stated at trial, "basically strapp[ing] himself into a rocket and sho[oting] it into the City of Staunton" onto West Beverley Street – a rocket that would inevitably result in serious injury or death to people traveling in the commercial area. Thus, the evidence was sufficient to support the finding that the totality of appellant's volitional actions were such that a rational fact finder could infer implied malice.

### Specific Intent

"[T]he fact finder may infer that a person intends the immediate, direct, and necessary consequences of his voluntary acts." Moody v. Commonwealth, 28 Va. App. 702, 706-07, 508 S.E.2d 354, 356 (1998).

> *The specific intent to commit [a crime] may be inferred from the conduct of the accused if such intent flows naturally from the conduct proven.* Where the conduct of the accused under the circumstances involved points with reasonable certainty to a specific intent to commit [the crime], the intent element is established.

Wilson v. Commonwealth, 249 Va. 95, 101, 452 S.E.2d 669, 674 (1995) (emphasis added) (citation omitted).

The rational fact finder standard used in sufficiency of the evidence appeals recognizes that a fact finder may "draw reasonable inferences from basic facts to ultimate facts." Haskins v. Commonwealth, 44 Va. App. 1, 10, 602 S.E.2d 402, 406 (2004) (citations omitted). According to the record on appeal here, appellant voluntarily drove a vehicle 42 to 72 miles per hour *above* the posted speed limit of 35 miles per hour, out of a through lane of traffic and into a turn lane, in a commercial area where many vehicles were traveling at slow rates of speed, thereby causing a multiple-car crash in which several people were severely injured. This is not a case where vehicles traveling at a high rate of speed on an expressway or interstate highway simply collided. Instead, appellant's vehicle alone was traveling at such a dangerous rate of speed, given his surroundings inside the City of Staunton, that a rational fact finder certainly could infer that

appellant intended "the immediate, direct, and necessary consequences of his voluntary acts."

Moody, 28 Va. App. at 706-07, 508 S.E.2d at 356.

Therefore, the trial court did not err in its finding of specific intent.

### B. Intentional Destruction of Property Convictions

Code § 18.2-137(B) reads in pertinent part, "If any person intentionally causes such injury, he shall be guilty of . . . (ii) a Class 6 felony if the value of or damage to the property, memorial or monument is $1,000 or more." This Court has determined

> that Code § 18.2-137(B) attaches criminal liability when a person performs a volitional act that damages the property of another *and* the person specifically intends to cause damage to the property by that act . . . Code § 18.2-137(B) does not criminalize the mere performance of a volitional act conducted in a criminally negligent manner that happens to damage the property of another.

Scott v. Commonwealth, 58 Va. App. 35, 49, 707 S.E.2d 17, 25 (2011).

Appellant argues that this case is similar to Scott where this Court reversed Scott's conviction of felony property destruction under Code § 18.2-137(B). This Court, in reversing, reasoned that the trial court had found Scott's actions were unintentional and had acquitted him of first-degree murder, malicious wounding, and attempted malicious wounding. In finding Scott guilty of felony property damage, the trial court stated that Scott's reckless driving amounted to negligence so gross, wanton, and culpable as to show a reckless disregard of human life, or criminal negligence. This Court found that criminal negligence did not satisfy the intent requirement of Code § 18.2-137(B).

However, unlike in Scott, the trial court here found appellant guilty of malicious wounding and guilty of *intentionally* destroying property (not acting with criminal negligence). Therefore, Scott does not control our analysis. Instead, we consider whether appellant had specific intent to destroy property in violation of Code § 18.2-137(B).

The requisite specific intent "may, like any other fact, be shown by circumstances. Intent is a state of mind which can be evidenced only by the words or conduct of the person who is claimed to have entertained it." When facts are equally susceptible to more than one interpretation, one which is consistent with the innocence of the accused, the trier of fact cannot arbitrarily adopt an inculpatory interpretation. The fact finder, however, is entitled to draw inferences from proved facts, so long as the inferences are reasonable and justified. Furthermore, *the fact finder may infer that a person intends the immediate, direct, and necessary consequences of his voluntary acts*. Thus, when the fact finder draws such inferences reasonably, not arbitrarily, they will be upheld.

Moody, 28 Va. App. at 706-07, 508 S.E.2d at 356 (emphasis added) (citations omitted). The requisite intent must be determined from "'the outward manifestation of [a person's] actions leading to usual and natural results, under the peculiar facts and circumstances disclosed.'" Hughes v. Commonwealth, 18 Va. App. 510, 519, 446 S.E.2d 451, 457 (1994) (quoting Ingram v. Commonwealth, 192 Va. 794, 801, 66 S.E.2d 846, 850 (1951)).

Here, the record strongly supports the inference that the "outward manifestation" of appellant's actions was the intentional and volitional driving of a car at extremely high speeds within a commercial area of the City of Staunton, and out of a through lane of traffic into a left turn lane where he crashed into the back of another vehicle (and then caused both vehicles to hit a third vehicle). Id. A rational fact finder could certainly find that appellant intended the "immediate, direct, and necessary consequences" of his "voluntary acts" in a populated area where numerous cars were present and that he thus intended the damage to the vehicles and property in violation of Code § 18.2-137(B). Moody, 28 Va. App. at 706-07, 508 S.E.2d at 356. Therefore, the trial court did not err in convicting appellant of felony destruction of property.

### III. CONCLUSION

In this case, ample evidence supports the trial court's finding that appellant is guilty beyond a reasonable doubt of malicious wounding of four individuals in violation of Code

§ 18.2-51, and of felony destruction of property in violation of Code § 18.2-137. Accordingly, for the foregoing reasons, we affirm these convictions.

Affirmed.

Elder, J., dissenting.

The majority holds that driving at approximately 42 to 72 miles per hour above the speed limit, in a populated area with numerous cars around is sufficient to support a finding that appellant acted maliciously when he caused the traffic accident that injured four people. The majority further holds that the "'outward manifestation'" of appellant's actions was the intentional and volitional driving of a car at extremely high speeds," which caused the intentional damage to three other vehicles. I believe that appellant's conduct—although appallingly egregious and reckless—constitutes mere negligence and that the evidence does not support a finding of implied malice or the specific intent to cause the destruction of property. I would therefore reverse appellant's convictions for malicious wounding and intentional destruction of property, and I respectfully dissent.

### Malicious Wounding

Code § 18.2-51 provides that

> If any person maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall . . . be guilty of a Class 3 felony. If such act be done unlawfully but not maliciously, with the intent aforesaid, the offender shall be guilty of a Class 6 felony.

The critical distinction in this case is whether appellant acted maliciously, rather than unlawfully, when he caused the traffic accident. Malice is "the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will. It may be directly evidenced by words, or inferred from acts and conduct which necessarily result in injury." Robertson v. Commonwealth, 31 Va. App. 814, 823, 525 S.E.2d 640, 645 (2000). Malice is not "confined to ill will, but includes any action flowing from a wicked or corrupt motive, done with an evil mind or wrongful intention, where the act has been attended with such circumstances as to carry in it the

plain indication of a heart deliberately bent on mischief." Williams v. Commonwealth, 13

Va. App. 393, 398, 412 S.E.2d 202, 205 (1991).

Malice may be express or implied by conduct. Coleman v. Commonwealth, 184 Va. 197,

201, 35 S.E.2d 96, 97 (1945). "'Implied malice exists when any *purposeful, cruel act* is

committed by one individual against another without any, or without great provocation.'" Essex

v. Commonwealth, 228 Va. 273, 280, 322 S.E.2d 216, 220 (1984) (quoting Pugh v.

Commonwealth, 223 Va. 663, 668, 292 S.E.2d 339, 341 (1982)). The wrongful act must be done

"willfully or purposefully." Williamson v. Commonwealth, 180 Va. 277, 280, 23 S.E.2d 240,

241 (1942).

Although the majority accurately describes the events that gave rise to the traffic

accident, I do not agree this evidence supports a finding that appellant's conduct was so vicious

or extremely indifferent as to rise to the level of malice. The Supreme Court in Essex explained

that in order to sustain a conviction for second-degree murder,

> the victim must be shown to have died as a result of the
> defendant's conduct, and the defendant's conduct must be shown
> to be malicious. In the absence of express malice, this element
> may only be implied from conduct likely to cause death or great
> bodily harm, willfully or purposefully undertaken. Thus, for
> example, one who deliberately drives a car into a crowd of people
> at a high speed, not intending to kill or injure any particular person,
> but rather seeking the perverse thrill of terrifying them and causing
> them to scatter, might be convicted of second-degree murder if
> death results. One who accomplishes the same result
> inadvertently, because of grossly negligent driving, causing him to
> lose control of his car, could be convicted only of involuntary
> manslaughter. In the first case the act was volitional; in the second
> it was inadvertent, however reckless and irresponsible.

Essex, 228 Va. at 281, 273 S.E.2d at 220. The majority believes appellant's conduct falls under

the former scenario; I believe it falls under the latter.

Here, the evidence showed that appellant, while traveling in excess of 100 miles per hour,

drove in a left turn lane, in an area with a posted speed of 35 miles per hour, and where other

- 17 -

vehicles were turning into and out of traffic. It is clear that appellant is guilty of "an appalling degree of reckless driving." Id. at 284, 273 S.E.2d at 222. However, the fact-finder "could only speculate, upon this evidence, whether the defendant embarked upon his ill-fated course of conduct willfully and with a malicious purpose. No facts were proved from which such a purpose can be inferred." Id. Appellant embarked on the trip for the stated purpose of driving Stanley Colvin to the local Department of Motor Vehicles. Further, the fact that he applied the brakes indicates that he did not intend to strike Benbow's Jeep, whether out of self-preservation or concern for the safety of others. Although the skid marks did not indicate an attempt to avoid Benbow's Jeep, this is not dispositive of appellant's guilt because it is just as reasonable to believe that he had very little time to react given the extremely reckless speed at which he was driving. And, although appellant appeared to be laughing as he was driving at a high rate of speed, the evidence is insufficient to supply the context for appellant's behavior without resorting to speculation and surmise. Compare Haywood v. Commonwealth, 20 Va. App. 562, 567, 458 S.E.2d 606, 608-09 (1995) (noting that "while the evidence may support an hypothesis that Haywood acted with malice and intended to run over or through anyone or anything that got in his way," the evidence did not exclude the reasonable hypothesis of innocence that he "merely attempted to run a roadblock to avoid apprehension"), with Holley v. Commonwealth, 44 Va. App. 228, 235, 604 S.E.2d 127, 130-31 (2004) (holding that the act of accelerating towards a police officer established sufficient evidence to support the inference that the defendant sought to escape apprehension *and* intended to injure the police officer while doing so).

The Supreme Court made clear that "if the [injury] results from negligence, however gross or culpable, and the [injury] is contrary to the defendant's intention, malice cannot be implied." Essex, 228 Va. at 280, 322 S.E.2d at 220. Appellant deliberately chose to drive a car at a high rate of speed, but such evidence does not indicate an intent to viciously cause the traffic

- 18 -

accident that led to the injuries of four people. Because I believe the evidence does not support a finding of the requisite element of malice, I would reverse and remand the matter to the trial court so that the Commonwealth may pursue charges on the lesser-included offense of unlawful wounding, if it be so advised.

Intentional Destruction of Property

Code § 18.2-137(B) provides that a person who "*intentionally* causes" the destruction or damage of property is guilty of "a Class 6 felony if the value of or damage to the property . . . is $1,000 or more." (Emphasis added). "Code § 18.2-137(B) attaches criminal liability when a person performs a volitional act that damages the property of another *and* the person specifically intends to cause damage to the property by that act." Scott v. Commonwealth, 58 Va. App. 35, 49, 707 S.E.2d 17, 25 (2011). By contrast, "any person [who] *unlawfully* destroys, defaces, damages or removes without the intent to steal any property, real or personal, not his own" is guilty of a Class 3 misdemeanor. Code § 18.2-137(A) (emphasis added). The use of the term "unlawfully" "connote[s] a less culpable mental state than the word 'intentionally.'" Scott, 58 Va. App. at 51, 707 S.E.2d at 25. An unlawful act simply requires "the performance of a lawful act in a criminally negligent manner." Crowder v. Commonwealth, 16 Va. App. 382, 385, 429 S.E.2d 893, 894, aff'd on reh'gen banc, 17 Va. App. 202, 436 S.E.2d 192 (1993). Thus, "Code § 18.2-137(B) does not cover criminally negligent conduct—instead, such conduct falls under Code § 18.2-137(A)." Scott, 58 Va. App. at 53, 707 S.E.2d at 26.

Similar to the discussion above, I believe the evidence falls just short of supporting a finding of specific intent to cause the destruction of property under Code § 18.2-137(B). Although Scott left open the "question of whether an unintended consequence can be so probable and foreseeable as to be deemed intentional under the statute," 58 Va. App. at 54 n.10, 707 S.E.2d at 27 n.10, this is not the case here. Driving in an appallingly reckless manner in and of

- 19 -

itself is not sufficient evidence that appellant intended to hit anyone. The fact that he applied his brakes with such force—resulting in a thirty-mile-per-hour decrease in speed—supports the reasonable hypothesis of innocence that he lacked such intent. Because our case law makes very clear that crimes involving malice require the specific intent to cause the effect, anything that involves negligence, no matter how severe, is insufficient as a matter of law. For these reasons, I would reverse appellant's convictions for intentional destruction of property and remand the matter to the trial court so that the Commonwealth may pursue charges on the lesser-included offense of unlawful destruction of property, if it be so advised.